GEORGE MAY
P.O. Box 31217, Palm Beach Gardens, FL 33420

1
2
3
4

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FILED

00 OCT 10 PM 1:48

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

5   George May,                          )
6           Plaintiff,                   )   CASE NO: 8:00CV2079-T-23
7   vs.                                  )                         B
8   Susan C. Buckew Coram Non            )
    Judice, as a private person,         )
9   Donald Trump, and the Trump          )
    Organization, Inc., jointly,         )
10  and severally,                       )
                                         )
11          Defendant's,                 )
                                         )
12  _____ )

13
14
15
16
17

18                          COMPLAINT

19      1. COMES NOW, the plaintiff, George May, and files this

20  his complaint, and claims as follows:

21

22                            FACTS

23

24      2. The following facts are common to all counts, and

25  causes of action hereinafter plead.

26

27   T 669/
28   #1150.00

GEORGE MAY
P.O. Box 33247, Palm Beach Gardens, FL 33420

JURISDICTION

3. This honorable court has jurisdiction over this case under English Common Law, harking back to 1618, Article I., Section 10., Clause I., Article III., Section 2., Clause I., Article VI, Clause 2., Article VI., Clause 3., and Amendment VII., of the United States of America Constitution, and the Judiciary Act of 1789, Ch. 20, §34, 1 Stat. 73, 92.

4. The defendant's have no immunity under their Obligation of Contract Article VI., Clause 3., of the United States of America Constitution by the United States of America for plaintiff George May.

5. The defendant's have no immunity under English Common Law harking back to 1618, for breaking their contract of Article VI., Clause 3., of the United States of America Constitution. <u>Feather v. The Queen (Q.B. 1865) 6 B & S 257, 122 Eng. Rep. 1191; Ogden v. Saunders, 25 U.S. 213, 337, (12 Wheat.) 6 L. Ed. 606</u>.

6. The plaintiff, George May, is a citizen of the United States of America, residing and domiciled in West Palm Beach Florida, and a natural born citizen of the United States of America.

7. This is an action for damages in excess of $75,000.00.

8. The unlawful acts by the defendant's complained of herein were committed jointly, and were concurrent in nature so as to make all the defendant's jointly, and individually liable to the plaintiff, George May, for damages herein claimed.

9. The defendant Susan C. BucklewCoram Non Judice is being sued for impairment of her Obligation of Contract to the United States of America, that is for the plaintiff, George May, and

-2-

GEORGE MAY
P.O. Box 32247, Palm Beach Gardens, FL 33420'

1    for breaking her contract Oath with the United States of America,

2    that is for the plaintiff, George May, Article VI., Clause 3., her

3    Oath Contract by not upholding the United States of America Con-

4    stitution, and taking payoff's to help the defendant's Donald

5    Trump, and the Trump Organization, Inc., impair plaintiff's

6    Contract Treaty of 1783, by the United States of America, that is

7    for the plaintiff, George May, which harks back English Common

8    Law, providing protection for the plaintiff's discoveries, idea's

9    inventions, copyrights, concepts, trademarks, brands to 1618, to

10   rob plaintiff's property for unlawful self profit. The defendant's

11   have no immunity of any kind for their impairment of Obligation of

12   Contracts prohibited by Article I., Section 10., Clause I.,

13   Article VI., Clause 2., Article VI., Clause 3., Article III.,

14   Section 2., Clause I., Article IV, Section 2., Clause I., Amend-

15   ment VII., of the United States of America Constitution, the

16   Contract Treaty of 1783, that preserves English Common Law

17   liability for Susan C. Bucklew, and the defendant's Donald Trump,

18   and the Trump Organization, Inc., and that preserves Spanish

19   Common Law liability for their impairment of Obligation of Con-

20   tracts prohibited by Article I., Section 10., Clause I., Article

21   VI., Clause 3., Article VI., Clause 2., Article IV., Section 2.,

22   Clause I., Amendment VII., of the United States of America

23   Constitution.

24       10. The defendant Susan C. Bucklew, is a Citizen of the United

25   States of America, residing and domiciled in Tampa Florida.

26

27

28                          -3-

GEORGE MAY
P.O. Box 32747, Palm Beach Gardens, FL 33420

1     11. The defendant Donald Trump, is a Citizen of the United

2   States of America, residing and domiciled in West Palm Beach,

3   Florida. The Trump Organization, Inc., is a New York Corporation

4   incorporated in New York, with its principal place of business

5   in New York, doing business also in Florida.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                          -3.1-

27

28

GEORGE MAY
P.O. Box 37247, Palm Beach Gardens, FL 33420.

1          STATEMENT OF THE CASE

2

3      12. **The** plaintiff, George May, re-alleges, and re-avers

4   his claims and allegations contained in number 1., through 12.,

5   as if fully set forth herein, and would further state:

6      13. The defendant's have impaired their Obligation of Contract

7   by the United States of America with plaintiff, George May,

8   Article VI., Clause 2., Article VI., Clause 3., and have broken

9   their contract Article VI., Clause 3., with the United States

10  of America for plaintiff, George May, by entering without subject

11  matter jurisdiction, void, without jurisdiction of the subject

12  matter, without authority orders and judgements dismissing the

13  plaintiff's case number, 98-1737-CIV-T-24B               , helping

14  the defendant, Donald Trump, and the Trump Organization, Inc.

15  to pirate and rob the plaintiff's property, causing damages to

16  the plaintiff, George May, of $300  , million dollars.

17     14. The defendant, Donald Trump, and The Trump Organization,
    Inc.,

18  caused the defendant Coram Non Judice Susan C. Bucklew

19  to impair, their Obligation of Contract by the United States of

20  America with plaintiff, George May, and break their contract,

21  Article VI., Clause 3., with the United States of America for

22  plaintiff, George May, by entering without subject matter jur-

23  isdiction, void, without jurisdiction of the subject matter,

24  without authority orders and judgements dismissing the plaintiff's

25  case number,        98-1737-CIV-T-24B                , causing

26  damages to the plaintiff, George May, of $300 , million dollars.

27     15. That on  July 7, 1999              , defendant's dismissed

28  plaintiff's complaint in case number 98-1737-CIV-T-24B         ,

-4-

GEORGE MAY
P.O. Box 31217, Palm Beach Gardens, FL 33420.

1   by a without subject matter jurisdiction, void, without jur-

2   isdiction of the subject matter, without authority, order

3   judgement, impairing their Obligation of Contract by the United

4   States of America with plaintiff, George May, Article VI., Clause

5   2., Article VI., Clause 3., and breaking their contract Article

6   VI., Clause 3., with the United States of America for plaintiff,

7   George May, by dismissing plaintiff's complaint in case number

8   __98-1737-CIV-T-24B_____, causing damages to plaintiff

9   George May, of $300 , million dollars.

10       16. The defendant, Coram Non Judice_Susan C. Bucklew____

11   _____, knowingly acted outside of his jurisdiction, and

12   exceeded his authority, and cannot use his judicial status as

13   a defense under English Common Law, which is the law of the

14   United States of America. (Letter from Thomas Jefferson to

15   Edmund Randolf (Aug. 23, 1799), reprinted in 9 The Works of

16   Thomas Jefferson 76 (P. Ford ed. 1905); The Judiciary Act of

17   1789, Ch. 20., §34, 1 Stat. 73, 92; Article I., Section 10.,

18   Clause I., Article III., Section 2., Clause I., Article VI.,

19   Clause 2., Article VI., Clause 3., Amendment VII., of the

20   United States of America Constitution which preserves English

21   Common Law under the Treaty of September 3, 1783, and preserves

22   Spanish Common Law under the Treaty of 1819, the Antedated Treaty

23   Contract of 1848, and the Land Letters Patent Contract of 1850,

24   and 1851; Moravia v. Sloper, 125 Eng. Rep. 1039 (C.P. 1737);

25   Terry v. Huntington, 145 Eng. Rep. 557 (Ex. 1668), all of which

26   are Supreme over Federal Statutes, and Pre-Empt Federal Statutes.

27   See plaintiff's addendum attached herein.

28

GEORGE MAY
P.O. Box 33717, Palm Beach Gardens, FL 33420

COUNT I.
DAMAGES

17. The plaintiff, George May, re-alleges, and re-avers his claims and allegations contained in number 1., through 17., as if fully set forth herein and would further state:

18. The defendant's have caused damages to the plaintiff, George May, in the amount of $300 , million dollars, by their impairing their Obligation of Contract by the United States of America that is for the plaintiff, George May, Article VI., Clause 2., Article VI., Clause 3., and by breaking their Contract Article VI., Clause 3., with the United States of America that is for the plaintiff, George May.

19. The defendant's can raise no affirmative defense to their impairing their Obligation of Contract by the United States of America with plaintiff, George May, Article VI., Clause 2., Article VI., Clause 3., and their breaking their Contract Article VI., Clause 3., with the United States of America that is for the plaintiff, George May.

20. The defendant's Obligation of Contract is a Civil Obligation that is a legal tie, which gives the plaintiff, George May the right of enforcing its performance by law. Ogden v. Saunders, 25 U.S. 213, 337, (12 Wheat.) 6 L. Ed. 606.

21. The plaintiff, George May, demands a trial by jury as required by Amendment VII, [1789], of the United States of America Constitution, according to the English Common Law, preserved under Article VI, of the United States of America Constitution, and the Treaty of Paris, September 3, 1783.

-6-

*(left column fragments, partially visible from facing page:)*

s not merely cumulative or
roduce a different result);
. 1993) (denial of motion
lence affirmed where the
ind was not likely to pro-
's'n *Local Union No. 597*,
told defense counsel that
ie plaintiff, the defendant
Civ. P. 60(b)(2). At the
th Amendment privilege
erence from this, refused
ie district court properly
.l evidence in deciding
igment. A Rule 60(b)(2)
icroachment on the role
*land Mut. Life Ins. Co.*
ratory judgment action,
to murder her husband
· life with the intention
verdict, the jury found
lgment was entered in
legree murder for her
judgment under Rule
:overed evidence that
trict court denied the
the disputed issue of
t court did not abuse
in relief under Rule
ed at the time of the
until a year later, so

912 (9th Cir. 1991),
tor-in-possession in
ie statements made
constitute fraud on
the judicial sale);
(a litigant's willful
istances, constitute
f from an adverse

ns does not apply
't. However, fraud
igainst an adverse

*(main column:)*

party. Fraud on the court is shown only where the conduct seriously affects the integrity of the normal process of adjudication. *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320 (2d Cir. 1985); *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457 (2d Cir. 1994). The time limitation of one year generally applicable to motions under Rule 60(b)(3) does not apply to a motion for relief from judgment based on fraud upon the court. One species of fraud upon the court occurs when an officer of the court perpetuates fraud affecting the ability of the court or jury to impartially judge a case. *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128 (9th Cir. 1995).

**4. The judgment is void.** If a judgment is void, it must be set aside; discretion plays no role with respect to a void judgment. *See Orner v. Shalala*, 30 F.3d 1307 (10th Cir. 1994). The primary ground for attacking a judgment as void is that it was rendered in the absence of jurisdiction, either subject matter or personal. *See United States v. Forma*, 42 F.3d 759 (2d Cir. 1994) (default judgment against the United States should have been set aside as void, since the claim was precluded by sovereign immunity and was therefore outside the subject matter jurisdiction of the court); *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457 (2d Cir. 1994) (default judgment was not void because the district court did have subject matter jurisdiction). A judgment is also void if it violates due process. *See Orner v. Shalala*, 30 F.3d 1307 (10th Cir. 1994). There is no time limit with regard to attacking void judgments. *Orner v. Shalala*, 30 F.3d 1307 (10th Cir. 1994); *Briley v. Hidalgo*, 981 F.2d 246 (5th Cir. 1993).

**5. The judgment has been satisfied, released, or discharged, etc.** *See Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992) (The Supreme Court held that an institutional reform consent decree could be modified if the district court determined that there had been a significant change in law or fact that warranted a modification and the modification was tailored to the change in circumstances.); *Board of Educ. of Oklahoma City Pub. Schools v. Dowell*, 498 U.S. 237, 111 S. Ct. 630, 112 L. Ed. 2d 715 (1991) (The Supreme Court held that a desegregation decree could be modified if its purposes had been fully achieved and remanded the action for a determination of whether the school district was being operated in compliance with the equal protection clause, and whether it was unlikely that the school board would return to its former ways.); *Alexis Lichine & CIE v. Sacha A. Lichine Estate Selections, Ltd.*, 45 F.3d 582 (1st Cir. 1995) (district court did not abuse its discretion in declining to modify a recently entered consent decree); *Gould v. Bowyer*, 11 F.3d 82 (7th Cir. 1993) (court acted properly in vacating judgment upon discovery that the underlying dispute had been settled). *Cf. Consumer Advisory Bd. v. Glover*, 989 F.2d 65 (1st Cir. 1993) (a consent decree remains in effect until the district court makes a clear statement of its intent to terminate the decree).

GEORGE MAY
P.O. Box 32247, Palm Beach Gardens, FL 33420

1    WHEREFORE, the plaintiff, George May, demands judgement

2    against the defendants for damages of $300 , million dollars

3    interest at the statutory rate, costs, and attorney fees,

4    forthwith as they can raise no affirmative defense to their

5    impairing their Obligation of Contract by the United States of

6    America with plaintiff, George May, Article VI., Clause 2.,

7    Article VI., Clause 3., and their breaking their Contract

8    Article VI., Clause 3., with the United States of America that

9    is for the plaintiff, George May.

10

11

12

13

14

15

16

17

18

19                          Respectfully submitted

20

21                          George May
                            P.O. Box 32247
                            Palm Bch. Gardens
22                          Fl. 33420
                            561-333-7334
23

24

25

26

27                          -7-

28

other things, that TRUMP "infringed on Plaintiff's copyrighted works

. . . and interfered with the Plaintiff's contracts, business,

prospective business advantage . . . " (Paragraph 17 of Complaint,

attached as Exhibit "A"). MAY further alleged that TRUMP engaged in

unfair trade practices and unfair competition (Paragraph 18), and

that TRUMP interfered with Plaintiff's business by "donating

$50,000.00 to Jeb Bush" (Paragraph 23), interfered "with the due

prosecution of Plaintiff's business," and enticed "plaintiff's

customers to have no business relations or transactions with the

Plaintiff." (Paragraph 31) Plaintiff's business was described as

"a theme park, and airport . . . using off reservation gaming

compacts, on property leased . . . to the Seminole Indian Tribe and

gaming, as a business plan, marketing plan, advertising plan, for

his airport and Theme Park Projects." (Paragraph 21)

By Order dated July 7, 1999, the Honorable Susan C.

Bucklew, United States District Court Judge, granted TRUMP's Motion

to Dismiss, dismissing Plaintiff's federal claim with prejudice for

failure to state a claim upon which relief may be granted.

Plaintiff's state law claims were dismissed without prejudice. See

Order attached as Exhibit "B."

In her Order, Judge Bucklew concluded that there was no

diversity jurisdiction, and that Plaintiff's attempt to state a

cause of action for federal copyright infringement and trademark

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA   () SEP 28  1:21
TAMPA DIVISION

GEORGE MAY,

            Plaintiff,

v.                                Case No. 8:98-Civ-1737-T-24(B)

DONALD TRUMP, et al.,

            Defendants.
_____/


## ORDER

This cause comes before the Court on the plaintiff's Motion to Set Trial or Motion for Final Judgment (Doc. No. 11).  Upon consideration, it is ORDERED AND ADJUDGED that the plaintiff's Motion to Set Trial or Motion for Final Judgment (Doc. No. 11) is DENIED.

**DONE AND ORDERED** at Tampa, Florida, this 28ᵗʰ day of September, 2000.

                          Sn C. Bucklew
                          SUSAN C. BUCKLEW
                          United States District Judge

Copies to:
Pro se Plaintiff
Counsel of Record

# BUSINESS BRIEFS

## Suncoast on track to open Tuesday

The Suncoast hotel-casino is on track for a Tuesday evening opening, according to David Ross, the resort's vice president and general manager.

The $200 million Coast Resorts property at the intersection of Rampart Boulevard and Alta Drive was scheduled to finish its fire and life safety tests over the weekend, Ross said.

The Suncoast, Coast Resorts' fourth casino, has tentatively planned to open following a 7:30 p.m. fireworks show on Tuesday. The resort is scheduled to open with 200 hotel rooms and 5,000 parking spaces.

A 16-screen movie theater, 500-seat showroom and a 64-lane bowling center will provide a variety of entertainment options. The Suncoast has four restaurants, a buffet, an oyster bar, a fast-food counter, a coffeehouse and an ice cream parlor, as well as a lounge and a showroom bar.

The Suncoast's 80,000-square-foot casino will have 2,000 slot machines and 48 table games.

NEW YORK

## Trump casino plan faces opposition

Donald Trump may have to find another way to make his next millions, if Sen. Charles Schumer gets his way.

Schumer said last week that Trump will "face serious opposition" if he tries to go forward with his reported plan to team up with an American Indian tribe to open the world's largest casino on the west side of Manhattan.

Trump said in Tuesday's New York Post that if state and federal officials approve a proposal for the St. Regis Mohawk Indians to open a casino in the Catskills, he may propose building one with another Indian tribe on 100 acres of underdeveloped land he owns near the Hudson River.

The billionaire developer fears that a casino in the

Catskills would siphon business away from Atlantic City, where he owns three hotels.

New York state law prohibits casinos, but federal law allows them on Indian reservations. Indian tribes also can have off-reservation land put into trust for a casino. There was no word on which tribe Trump would be dealing with.

LITTLE ROCK, Ark.

## Signatures OK'd for Arkansas vote

Gambling proponents have collected enough signatures to put a casino measure on the

Nov. 7 ballot, the secretary of state's office said last week.

State workers counted 80,901 valid signatures of registered voters — well more than the 70,601 required, said secretary of state spokesman Jonathon Runnels.

In all, the office checked 125,315 signatures submitted by Arkansas Casino Corp., which is heading the campaign and wants to run casinos in six counties.

The secretary of state's office certified the proposed constitutional amendment for the ballot. Gov. Mike Huckabee and several church-related groups are opposed to the measure.

## HAVING FINANCIAL DIFFICULTY

We can direct you to the Right people who can help Regardless of your past problems.

CALL NOW 1-866-272-8685 Toll Free

---

## Hair Transplantation

---

Tired of the Ups & Downs of the Stock Market?
Trust Deed Investments
Earn 14% Annually
www.PacificWestMortgage.com
NV Lic #00021          (702) 892-3737





April 21, 1997

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 32247

Dear Mr. May:

Thank you very much for all the information you sent relative to my concerns in Palm Beach; it is very much appreciated.  I believe this material will be quite helpful, and I have sent it on to my attorneys for review.

With best wishes,

Sincerely,

Donald J. Trump

**THE TRUMP ORGANIZATION**
725 FIFTH AVENUE · NEW YORK, N.Y. 10022   212 · 832 · 2000   FAX 212 · 935 · 0141

6-27-98


To; Donald Trump
    FAX 212-935-0141


Re; Seminole Tribe of
    Florida, I-95 Interchange
    Property


Dear Donald,


At one time it was discussed that the Seminole
tribe of Florida, by entering into compacts
could put their casinos on property leased or
owned by the tribe, outside of their reservations.

This has been done in California, I am told.

This type of agreement could make you golf course,
a hot item.

The State of Florida should have provided you with
an I-95 exit at summit blvd. There still may be time
to get an exit put in.

My I-95 property would be an excellent location for a
Seminole Tribe Casino, it is still available, 25 acres
can be purchased for only $2,500,000.00.


                    With best wishes


                    George May
                    P.O. Box 32247
                    Palm Bch. Gardens
                    Fl. 33420
                    963-5135



**SEMINOLE TRIBE OF FLORIDA**

6073 STIRLING ROAD
HOLLYWOOD, FLORIDA 33024
PHONES: (305) 581-8217
        (305) 581-8232
TELECOPIER: (305) 587-5492 — FAX

*Jim Shore*
GENERAL COUNSEL

# The Palm

MONDAY, AUGUST 17, 1998          FIN/

# Casinos put state, Seminoles at odds

## Congress urged to clarify law

**By Jenny Staletovich**
*Palm Beach Post Staff Writer*

More than 200 years ago, the framers of the Constitution cut a deal with the nation's Indians that today may clear the way for 24-hour casinos featuring booze, blackjack, lotteries, parimutuels and other games of chance year-round.

It's a deal that has brought negotiations for tribal casinos to the table and thrust the issue into courtrooms around the state.

Now, seven years after the Seminole Tribe of Florida first asked to open full-blown casinos, maneuvering over the issue is intensifying:

■ A tribal proposal is being reviewed by the state.

■ Donald Trump has teamed up with the tribe to persuade a stubbornly opposed Gov. Lawton Chiles. In May, Trump forked over a $50,000 contribution to the Republican Party for safe measure.

■ National negotiations are out for discussion next month

## Body of Kenya bombing vict



**4A**   T. PALM BEACH POST   MONDAY, AUGUST 17, 1998

# Tribe could make $500 mill

## CASINOS
*From 1A*

"This is a country built on land stolen from one people by another people," he said. "As a result, we carry some baggage and part of our duty is the responsibility owed to the aboriginal people. And that wrapped up in two words is trust responsibility."

The trust responsibility stems from a Constitutional clause that put governing of Indian commerce in the hands of Congress. Over the years it has come to mean questions of law should be resolved in favor of Indians, or "sort of a tie in favor of the runner in baseball," Rogow said.

"It's kind of the ultimate Judeo-Christian guilt."

Across the nation, tribal gambling has become wildly profitable. In Connecticut, the Mashantucket Pequot tribe opened the largest casino in the western hemisphere in 1992 and collects as much as $1 million daily. The Mohegan tribe, which opened a nearby casino in 1996, attracts 20,000 gamblers a day. Last year, the Eastern Band of the Cherokee tribe unveiled an $82 million casino in North Carolina after striking a partnership with Harrah's Entertainment.

### Seminoles' business is booming

Altogether, about 125 gambling compacts between states and tribes have been drawn up, Glogau said.

So, it's no wonder that the Seminole tribe, which has made millions off high stakes bingo halls, wants to open casinos on land around the state.

When the Seminole tribe was officially recognized in 1957, it had a budget of just $12,000. For years, members had been living off handouts from the government.

Then, in the early 1970s, it began selling tax-free cigarettes and boosted its income to $4.5 million. Bingo raised the stakes even higher. In the early 1980s, its 2,500 members each received monthly payments of about $80

## High stakes

The Seminole tribe is negotiating with the state to operate 24-hour casinos on tribal land. Currently, the state allows gaming halls with high stakes bingo, stud poker and Texas Hold 'Em. A lawsuit is pending over the tribe's slot machines.

**1 Tampa** *Seminole Gaming Palace*
**2 Ft. Pierce** *Reservation*
**3 Brighton** *Seminole Bingo Casino*
**4 Big Cypress** *Reservation*
**5 Immokolee** *Seminole Gaming Palace and Casino*
**6 Hollywood** *Hollywood Seminole Gambling*

SOURCE: Seminole Tribe of Florida

KEY
Reservation only ●
Reservation and gambling ■

STAFF GRAPH

## The Seminoles' proposal

A gambling compact submitted by the Seminole Tribe and proposing full casinos, video slot machines and lotteries is now being reviewed by state officials. Among the considerations are:

■ **Exclusive rights for casinos from the state.** In return, the tribe would cut the state in for 30 percent of the profits. If any others are granted rights, the payments would stop.

■ **Rules for running the casinos.** The National Indian Gaming Commission, not the state, would review and approve management contracts for operating the casinos. The state, however, would be allowed to monitor operations and would also review gaming licenses for employees. The tribe would be required to keep surveillance logs and logs of all payouts available to the state.

■ **Information or records** obtained by the state, however, would remain confidential unless the tribe agrees to disclose the findings.

■ **Any changes** in casino games or video slot machines approved in New Jersey, Nevada or Mississippi would automatically apply to Seminole gambling. However, if Florida revises gambling laws after the compact is passed, the tribe is not required to adopt the changes.

■ **Disputes between** the state and tribe would go to a mutually appointed mediator.

■ **The tribe** would reimburse the state all costs for overseeing Indian gambling.




retary Bruce Babbitt to issue rules. Babbitt stalled and in 1997 the tribe sued him. The case is pending in Miami federal court.

Meanwhile, the tribe contin-



# Odds against Trump, Seminoles for casinos

*The Associated Press*

TALLAHASSEE — Millionaire real estate mogul Donald Trump is raising the stakes in the Seminole tribe's bid for the right to open casinos on any of their tribal property in Florida.

Gov. Lawton Chiles' long-standing opposition to expanding gambling in Florida could make an agreement the tribe proposed a long shot.

With Trump's help, the Seminoles are trying to narrow the odds, paying former Florida Senate President Mallory Horne to lobby Chiles in favor of the agreement.

Horne said Trump hopes to manage the Seminole casinos. Trump couldn't be reached for comment.

The tribe's proposed 36-page agreement offers to give the state up to 45 percent of the profits if granted full casino gambling rights. If that is not feasible, the Seminoles say they are willing to give the state 30 percent of the profits if allowed to convert present bingo halls to casinos.

Chiles has opposed previous attempts to expand gambling in Florida, and voters have defeated three proposals to bring casinos to the state.

"The governor has made his position very clear over the years," spokeswoman April Herrle said. "He believes the Indians should be entitled to any form of gambling that is legal in Florida. As to the tribe's (proposed compact), we'll look at any proposal they put forward."

The Seminoles seek the right to convert high-stakes bingo halls in Tampa, Immokalee, Hollywood and Brighton into casinos and also open new gambling parlors in Miami, Orlando, Jacksonville and Coconut Creek.



*Jeb Bush is
A Good BET*

*Implied Contract For
Payment When Used*

# CERTIFICATE OF REGISTRATION

**FORM TX**
For a Literary Work
UNITED STATES COPYRIGHT OFFICE

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
*United States of America*

OFFICIAL SEAL

**TXu 869-554**

EFFECTIVE DATE OF REGISTRATION

**AUG 24 1998**

Month            Day            Year

ATE CONTINUATION SHEET.

---

## 1

**TITLE OF THIS WORK ▼**

TACTIC'S TO NEGOTIATE TRIBE GAMING COMPACTS

**PREVIOUS OR ALTERNATIVE TITLES ▼**
NONE

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   **Title of Collective Work ▼**
NONE

If published in a periodical or serial give: Volume ▼        Number ▼        Issue Date ▼        On Pages ▼

---

## 2

**a**

**NAME OF AUTHOR ▼**
George May

**DATES OF BIRTH AND DEATH**
Year Born ▼  1-6-46   Year Died ▼  NONE

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
Citizen of ▶ UNITED STATES
OR
Domiciled in ▶ PALM BCH. FLORIDA

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☒ No
Pseudonymous? ☐ Yes ☒ No
If the answer to either of these questions is "Yes," see detailed instructions

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
"LETTER, COMPILATION"

**NOTE**

Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
Citizen of ▶
OR
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
Citizen of ▶
OR
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous? ☐ Yes ☐ No
Pseudonymous? ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

---

## 3

**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
1994 ◀ Year

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ▶   Day ▶   Year ▶   ◀ Nation

---

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2 ▼
GEORGE MAY
P.O. BOX 32247
PALM BCH. GARDENS, FL. 33420

See instructions before completing this space.

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright ▼
NONE

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED

REMITTANCE NUMBER AND DATE

DO NOT WRITE HERE OFFICE USE ONLY

---

**MORE ON BACK ▶** • Complete all applicable spaces (numbers 5-11) on the reverse side of this page
• See detailed instructions   • Sign the form at line 10

DO NOT WRITE HERE
Page 1 of ___ pages

EXAMINED BY

CHECKED BY

☐ CORRESPONDENCE
☐ Yes

FORM TX

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**5** PREVIOUS REGISTRATION Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼
☐ This is the first published edition of a work previously registered in unpublished form.
☐ This is the first application submitted by this author as copyright claimant.
☐ This is a changed version of the work, as shown by space 6 on this application.
If your answer is "Yes," give: Previous Registration Number ▼          Year of Registration ▼

**6** DERIVATIVE WORK OR COMPILATION  Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation
Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates ▼

Material Added to This Work  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼
"Compilation of 1994 Newspaper technical Articles, Authors Letter"

See instructions before completing this space

**7** —space deleted—

**8** REPRODUCTION FOR USE OF BLIND OR PHYSICALLY HANDICAPPED INDIVIDUALS A signature on this form at space 10 and a check in one of the boxes here in space 8 constitutes a non-exclusive grant of permission to the Library of Congress to reproduce and distribute solely for the blind and physically handicapped and under the conditions and limitations prescribed by the regulations of the Copyright Office: (1) copies of the work identified in space 1 of this application in Braille (or similar tactile symbols); or (2) phonorecords embodying a fixation of a reading of that work; or (3) both.
a ☐ Copies and Phonorecords          b ☐ Copies Only          c ☐ Phonorecords Only          See instructions.

**9** DEPOSIT ACCOUNT If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.
Name ▼          Account Number ▼

CORRESPONDENCE Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/ZIP ▼
George May
P.O. Box 32247
Palm Bch. Gardens, Fl. 33420
Area Code and Telephone Number ▶ 561-963-5135

Be sure to give your daytime phone number

**10** CERTIFICATION* I, the undersigned hereby certify that I am the
Check only one ▶
☒ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☐ authorized agent of _____
Name of author or other copyright claimant, or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.
Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date
George May          date ▶ July 29, 1998
Handwritten signature (X) ▼

**11** MAIL CERTIFICATE TO
Name ▼ GEORGE MAY
Number/Street/Apartment Number ▼ P.O. BOX 32247
City/State/ZIP ▼ PALM BCH. GARDENS, FL. 33420

Certificate will be mailed in window envelope

YOU MUST:
• Complete all necessary spaces
• Sign your application in space 10
SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:
1. Application form
2. Nonrefundable $20 filing fee in check or money order payable to Register of Copyrights
3. Deposit material
MAIL TO
Register of Copyrights
Library of Congress
Washington, D.C. 20559

The Copyright Office has the authority to adjust fees at 5-year intervals, based on changes in the Consumer Price Index. The next adjustment is due in 1996. Please contact the Copyright Office after July 1995 to determine the actual fee schedule.

17 U.S.C. § 506(e): Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.



April 21, 1997

Mr. George May
P.O. Box 32247
Palm Beach Gardens, FL 32247

Dear Mr. May:

Thank you very much for all the information you sent relative to my concerns in Palm Beach; it is very much appreciated. I believe this material will be quite helpful, and I have sent it on to my attorneys for review.

With best wishes,

Sincerely,

Donald J. Trump

**THE TRUMP ORGANIZATION**
725 FIFTH AVENUE · NEW YORK, N.Y. 10022   212 · 832 · 2000   FAX 212 · 935 · 0141

GEORGE MAY
P.O. Box 37217, Palm Beach Gardens, FL 33420

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

George May,

      Plaintiff,        CASE NO: 98-1737-CIV-T-24B

vs.

Donald Trump, and
The Trump Organization,
Inc., jointly, and
severally,

      Defendant's

_____/

## SUSAN C. BUCKLEW

PLAINTIFF, GEORGE MAY, GIVES JUDICIAL NOTICE 20 AM. JUR.
67, OF THE COURTS REQUIREMENT UNDER ARTICLE VI., CLAUSE
3., OF THE UNITED STATES OF AMERICA CONSTITUTION, AND
THE UNITED STATES OF AMERICA CONSTITUTION, AND ENGLISH
COMMON LAW, THAT THE JUDGEMENT IN THIS CASE IS REVERSED,
FOR LACK OF SUBJECT MATTER JURISDICTION, AND THAT A JUDGE-
MENT FOR THE RELIEF REQUESTED IN THE PLAINTIFF'S COMPLAINT
BE ENTERED FORTH WITH

COMES NOW, plaintiff, George May, and gives this honorable

court judicial notice, 20 Am. Jur. 67., of the courts requirement

under Article VI., Clause 3., Obligation of Contracts by the United

States of America Constitution, and the United States of America

Constitution, and English Common Law, that the judgement in this

case is reversed for lack of subject matter jurisdiction, and re-

quest that a judgement for the relief requested in the plaintiff's

complaint be entered forthwith, for cause as follows:

-1-

GEORGE MAY
P.O. Box 32717, Palm Beach Gardens, FL 33420

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1. That the judge on this case is impairing his obligation of contract by the United States of America Constitution, and Article VI, of the United States of America Constitution, his contract oath to uphold the United States of America Constitution, and can be sued under English Common Law, and has no immunity, as he is breaking his Obligation of contract, with the plaintiff, Ogden v. Saunders, 25 U.S. 213, 337, (12 Wheat.) 6 L. Ed. 606; United States v. One Zumstein Briefmarken Katalog 1938, D.C.Pa., 24 F. Supp. 516, 519; Moravia v. Sloper, 125 Eng. Rep. 1039 (C.P. 1737); Terry v. Huntington 145 Eng. Rep. 557: (Ex. 1668); Feather v. Queen (Q.B. 1865) 6 B & S 257, 122 Eng. Rep. 1191.; Chisholm v. Georgia (1793) 2 Dall 419, 1 L. ed. 440) Justice James Wilson.

2. That the defendant in this case is impairing his obligation of contract by the United States of America Constitution by causing the judge on this case to break his obligation of contract by the United States of America, and Article VI, Clause 3., of the United States of America Constitution, his contract oath to uphold the United States of America Constitution, by not paying the plaintiff, George May, for his property pirated, robbed by the defendant. Medallion Stores, Inc. v. Eidt, Tex-Civ. App. 405 S.W. 2d 417, 422; Thompson v. Zurich Ins. Co. D.C. Minn. 309 F. Supp. 1178, 1181, and by causing Obstruction of Justice. Toledo Newspaper Co. v. U.S. 247 U.S. 402, 38 S. Ct. 560, 564, 62 L. Ed 1186, a criminal act under 18 U.S.C.A. §1501 et. seq. and a prohibited act under Ch. 21, 18 USCS §401.

-2-

WHEREFORE, the plaintiff, George May, gives to this
honorable court judicial notice 20 Am. Jur. 67, that the
Constitution of the United States of America, English Common
Law harking back to 1618, the Judiciary Act of 1789, Ch. 20,
§34, 1 Stat. 73, 92, Article I., Section 10., Clause I.,
Article III., Section 2., Clause I., Article VI., Clause 2.,
Article VI., Clause 3., Amendment VII., of the United States
of America Constitution, the Treaty of Paris of September 3,
1783, The Treaty contract of 1819, the Antedated Treaty con-
tract of 1848, the contract of September 28, 1850, and the
Land Patent Contract of 1850, and 1851, requires that a judge-
ment be entered for the plaintiff, George May, for the relief
requested in his complaint, forthwith, or that the plaintiff,
George May, file a complaint against the judge in this case
and the defendant, for impairment of the Obligation of his
contract by the United States of America Constitution, Article
VI., Clause 3., and the United States of America Constitution,
for which there is no immunity for breach of contract, under
English Common Law.

Respectfully submitted

George May
P.O. Box 32247
Palm Bch. Gardens
Fl. 33420
561-333-7334

-3-

GEORGE MAY
P.O. Box 32247, Palm Beach Gardens, FL 33420

1          I hereby certify that a copy of the foregoing was mailed

2    this October 2, 2000, to:

3

4    John B. Marion IV, Esq.
     Seller, Marion et. al.
5    P.O. Box 3767
     West Palm Bch., Fl. 33402
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21        George May
      P.O. Box 32247
22    Palm Bch. Gardens
      Fl. 33420
23    561-333-7334

24

25

26             -4-

27

28

## $240 million verdict

# Jury: Disney pirated ideas

The entertainment giant stole the concept behind its Wide World of Sports complex, jurors found.

By Mike Schneider
*The Associated Press*

ORLANDO — The Walt Disney Co. stole ideas for a sports complex from two businessmen and should pay $240 million in damages, a six-member jury decided Friday.

Nicholas Stracick, Edward Russell and their company, All Pro Sports Camps Inc., accused Disney of fraud, theft of trade secrets, breaking an implied contract, misrepresentation and breaching a confidential relationship. They sought $1.4 billion in damages.

The jury accepted all claims except fraud.

"It says to America that small companies can get justice," Johnnie Cochran Jr., attorney for the plaintiffs, said afterward. "They had the idea, and you can't take someone's ideas in America, and that's what this company did."

Stracick said he thought all along that a jury would believe his story. "We worked our butts off," he said. "Disney took advantage of it and ran with it."

Gary: Rare victory against Disney puts Stuart trial attorney 'on cloud nine.'
**STORY, 16A**

Besides Cochran, a member of O.J. Simpson's defense "dream team," Stracick and Russell were represented by Sewall's Point resident Willie Gary, who has offices in Stuart and Fort Pierce, and West Palm Beach appellate attorney Edna Caruso.

"They stole the dream, concept and idea of these men, and they lied about it," Gary said Friday. "They lied about it. That's the bottom line."

Gary said the verdict could be worth as much as $720 million because jurors decided Disney's actions were intentional and malicious, which allows a judge to triple the damage award. The judge, who has ultimate say over the verdict, is expected to hear post-trial motions in about 45 days.

Gary would not say how much he expects to receive, but he did say 25 to 30 percent is "in the right ballpark."

*Please see* DISNEY, 16A

ished or greatly restricted the doctrine of sovereign immunity at both the state and local levels.

The Supreme Court has held that local governments can be sued directly under 42 U.S.C.A. § 1983 for monetary, declaratory, or injunctive relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Department of Social Services of N. Y., 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789.

See also Governmental immunity; Sovereign immunity.

*Immunity from prosecution.* By state and federal statutes, a witness may be granted immunity from prosecution for his or her testimony (*e.g.* before grand jury). States either adopt the "use" or the "transactional" immunity approach. The federal government replaced the later with the former approach in 1970. The distinction between the two is as follows: "Use immunity" prohibits witness' compelled testimony and its fruits from being used in any manner in connection with criminal prosecution of the witness; on the other hand, "transactional immunity" affords immunity to the witness from prosecution for offense to which his compelled testimony relates.

Protection from prosecution must be commensurate with privilege against self incrimination, but it need not be any greater and hence a person is entitled only to protection from prosecution based on the use and derivative use of his testimony; he is not constitutionally entitled to protection from prosecution for everything arising from the illegal transaction which his testimony concerns (transactional immunity). Kastigar v. U. S., 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212.

*Interspousal immunity.* See Husband-wife tort actions.

*Property law.* A freedom on the part of one person against having a given legal relation altered by a given act or omission to act on the part of another person. Restatement of Property, § 4.

**Immunization.** The condition of being, or the act rendering one, immunized or protected, especially from communicable diseases.

**Impacted area.** An "impacted area" is an area whose school population has been burdened because of attendance by a large number of federal employees' children and which may at the same time be losing school tax revenue because of the United States Government's immunity from land taxes. Douglas Independent School Dist. v. Jorgenson, D.C.S.D., 293 F.Supp. 849, 850.

**Impact rule.** Rule formerly prevailing in many jurisdictions which required a blow or impact from without as a condition for recovering damages in negligence for emotional distress. Such rule has been abandoned in most jurisdictions today.

**Impair.** To weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner.

**Impaired capital.** Condition of a business when the surplus account shows a negative balance and hence the capital is reduced below its value from when the stock was issued.

**Impairing the obligation of contracts.** A law which impairs the obligation of a contract is one which renders the contract in itself less valuable or less enforceable, whether by changing its terms and stipulations, its legal qualities and conditions, or by regulating the remedy for its enforcement.

To "impair the obligation of a contract", within prohibition of Art. I, § 10, U.S.Const., is to weaken it, lessen its value, or make it worse in any respect or in any degree, and any law which changes the intention and legal effect of the parties, giving to one a greater and to the other a less interest or benefit, or which imposes conditions not included in the contract or dispenses with the performance of those included, impairs the obligation of the contract.

A statute "impairs the obligation of a contract" when by its terms it nullifies or materially changes existing contract obligations.

**Impanel.** The act of the clerk of the court in making up a list of the jurors who have been selected for the trial of a particular cause. All the steps of ascertaining who shall be the proper jurors to sit in the trial of a particular case up to the final formation.

**Imparcare /ɪmparkériy/.** In old English law, to impound. To shut up, or confine in prison. *Inducti sunt in carcerem et imparcati*, they were carried to prison and shut up.

**Impart /ɪmpárt/.** To have license to settle a litigation amicably; to obtain delay for adjustment.

**Imparlance /ɪmpárlən(t)s/.** In early practice, imparlance meant time given to either of the parties to an action to answer the pleading of the other. It thus amounted to a continuance of the action to a further day. Literally the term signified leave given to the parties to *talk together; i.e.,* with a view to settling their differences amicably. But in modern practice it denotes a time given to the defendant to plead.

A *general imparlance* is the entry of a general prayer and allowance of time to plead till the next term, without reserving to the defendant the benefit of any exception; so that after such an imparlance the defendant cannot object to the jurisdiction of the court, or plead any matter in abatement. This kind of imparlance is always from one term to another.

A *general special imparlance* contains a saving of all exceptions whatsoever, so that the defendant after this may plead not only in abatement, but he may also plead a plea which affects the jurisdiction of the court, as privilege. He cannot, however, plead a tender, and that he was always ready to pay, because by craving time, he admits that he is not ready, and so falsifies his plea.

A *special imparlance* reserves to the defendant all exceptions to the writ, bill, or count; and therefore after it the defendant may plead in abatement, though not to the jurisdiction of the court.

**Impartial.** Favoring neither; disinterested; treating all alike; unbiased; equitable, fair, and just.

ment; a reason for objecting or opposing; a feeling of disapproval.

The act of a party who objects to some matter or proceeding in the course of a trial, or an argument or reason urged by him in support of his contention that the matter or proceeding objected to is improper or illegal. Used to call the court's attention to improper evidence or procedure. Such objections in open court are important so that such will appear on the record for purposes of appeal. See· Fed.Evid.R. 103(a)(1); Fed.R.Civil P. 46,' and Fed.R.Crim.P. 51. See also Object (v).

*Objection to jury.* See Challenge.

**Objective symptom.** Those which a surgeon or physician discovers from an examination of his patient; "subjective symptoms" being those which he learns from what his patient tells him. Schroeder v. Western Union Telegraph Co., Mo.App., 129 S.W.2d 917, 922.

**Object of an action.** Legal relief to prevent or redress the wrong. The thing sought to be obtained by the action; the remedy demanded or the relief or recovery sought or prayed for; not the same thing as the cause of action or the subject of the action.

**Object of a statute.** Aim, intent or purpose of its enactment. End or design which it is meant to accomplish, while the "subject" is the matter to which it relates and with which it deals. Matter or thing forming groundwork of statute.

**Objects of a power.** Thôse among whom donee is given power to appoint.

**Objurgatrix** /òbjərgéytrəks/. In old English law, scolds or unquiet women were referred to as objurgatrices and were punished with the cucking-stool *(q.v.).*

**Oblata** /əbléydə/. Gifts or offerings made to the king by any of his subjects; old debts, brought, as it were, together from preceding years, and put on the present sheriff's charge.

**Oblata terræ** /əbléydə téhriy/. Half an acre, or, as some say, half a perch, of land.

**Oblate.** See Oblati.

**Oblate Rolls.** Chancery Rolls (1199–1641), called also Fine Rolls, containing records of payments to the king by way of oblate or fine for the grant of privileges, or by way of amercement for breach of duty.

**Oblati** /əbléyday/. In old European law, voluntary slaves of churches or monasteries.

**Oblati actio** /əbléyday ǽksh(iy)ow/. In the civil law, an action given to a party against another who had *offered* to him a stolen thing, which was found in his possession.

**Oblatio** /əbléysh(iy)ow/. Lat. In the civil law, a tender of money in payment of a debt made by debtor to creditor. Whatever is offered to the church by the pious.

**Oblation.** Oblations, or obventions, are offerings or customary payments made, in England, to the minister of a church, including *fees* on marriages, burials,

mortuaries, etc. *(q.v.),* and Easter offerings. They may be commuted by agreement.

**Oblationes dicuntur quæcunque a piis fidelibusque christianis offeruntur deo et ecclesiæ, sive res solidæ sive mobiles** /əblèyshiyówniyz dəkántər kwiykiŋkwiy èy páyəs fədlybǽskwiy kristiyéyməs òfərántər díyow èd əklíyzlyiy, sáyviy ríyz sólədiy sáyviy mówbəliyz/. Those things are called "oblations" which are offered to God and to the Church by pious and faithful Christians, whether they are movable or immovable.

**Obligate.** To bind or constrain; to bind to the observance or performance of a duty; to place under an obligation. To bind one's self by an obligation or promise; to assume a duty; to execute a written promise or covenant; to make a writing obligatory.

**Obligatio** /òbləgéysh(iy)ow/. Lat. In Roman law, a legal bond which obliges the performance of something in accordance with the law of the land. It corresponded nearly to our word contract. The legal relation existing between two certain persons whereby one (the creditor) is authorized to demand of the other (the debtor) a certain performance which has a money value. In this sense *obligatio* signifies not only the duty of the debtor, but also the right of the creditor. The fact establishing such claim and debt, as also the instrument evidencing it, is termed "obligation."

**Obligatio civilis** /òbləgéysh(iy)ow sivɪ́ləs/. An obligation enforceable by action, whether it derives its origin from the *jus civile,* as the obligation engendered by formal contracts or the obligation enforceable by bilaterally penal suits, or from such portion of the *jus gentium* as had been completely naturalized in the civil law and protected by all its remedies, such as the obligation engendered by formless contracts.

**Obligatio ex contractu** /òbləgéysh(iy)ow èks kəntrɛ́ktuw/. An obligation arising from contract, or an antecedent *jus in personam.* In this there are two stages,—first, a primary or sanctioned personal right antecedent to wrong, and, afterwards, a secondary or sanctioning personal right consequent on a wrong.

**Obligatio ex delicto, or obligatio ex maleficio** /òbləgéysh(iy)ow èks dəliktow/ˣmɛ̀ləfɪ́sh(iy)ow/. An obligation founded on wrong or tort, or arising from the invasion of a *jus in rem.* In this there is the second stage, a secondary or sanctioning personal right consequent on a wrong, but the first stage is not a personal right *(jus in personam),* but a real right *(jus in rem),* whether a primordial right, right of *status,* or of property.

**Obligation.** A generic word, derived from the Latin substantive "obligatio," having many, wide, and varied meanings, according to the context in which it is used. That which a person is bound to do or forbear; any duty imposed by law, promise, contract, relations of society, courtesy, kindness, etc. Rucks-Brandt Const. Co. v. Price, 165 Okl. 178, 23 P.2d 690; Helvering v. British-American Tobacco Co., C.C.A., 69 F.2d 528, 530. Law or duty binding parties to perform their agreement. An undertaking to perform. That which constitutes a legal or moral duty and which renders a person liable to coercion and punishment for neglecting it; a word of broad meaning, and the



particular meaning intended is to be gained by consideration of its context. An obligation or debt may exist by reason of a judgment as well as an express contract, in either case there being a legal duty on the part of the one bound to comply with the promise. Schwartz v. California Claim Service, 52 Cal.App.2d 47, 125 P.2d 883, 888. Liabilities created by contract or law (*i.e.* judgments). Rose v. W. B. Worthen Co., 186 Ark. 205, 53 S.W.2d 15, 16. As legal term word originally meant a sealed bond, but it now extends to any certain written promise to pay money or do a specific thing. Lee v. Kenan, C.C.A.Fla., 78 F.2d 425. A formal and binding agreement or acknowledgment of a liability to pay a certain sum or do a certain thing. United States v. One Zumstein Briefmarken Katalog 1938, D.C.Pa., 24 F.Supp. 516, 519. The binding power of a vow, promise, oath, or contract, of or law, civil, political, or moral, independent of a promise; that which constitutes legal or moral duty.

See also Contract; Duty; Liability.

*Absolute obligation.* One which gives no alternative to the obligor, but requires fulfillment according to the engagement.

*Conjunctive or alternative obligation.* The former is one in which the several objects in it are connected by a copulative, or in any other manner which shows that all of them are severally comprised in the contract. This contract creates as many different obligations as there are different objects; and the debtor, when he wishes to discharge himself, may force the creditor to receive them separately. But where the things which form the object of the contract are separated by a disjunctive, then the obligation is alternative, and the performance of either of such things will discharge the obligor. The choice of performing one of the obligations belongs to the obligor, unless it is expressly agreed that it shall belong to the creditor. A promise to deliver a certain thing or to pay a specified sum of money is an example of an alternative obligation. Civ.Code La. arts. 2063, 2066, 2067.

*Contractual obligation.* One which arises from a contract or agreement. See Contract.

*Current obligation.* See Current obligations.

*Determinate or indeterminate obligation.* A determinate obligation is one which has for its object a certain thing: as, an obligation to deliver a certain horse named Bucephalus, in which case the obligation can be discharged only by delivering the identical horse. An indeterminate obligation is one where the obligor binds himself to deliver one of a certain species: as, to deliver a horse, where the delivery of any horse will discharge the obligation.

*Divisible or indivisible obligation.* A divisible obligation is one which, being a unit, may nevertheless be lawfully divided, with or without the consent of the parties. An indivisible obligation is one which is not susceptible of division: as, for example, if I promise to pay you one hundred dollars, you cannot assign one-half of this to another, so as to give him a right of action against me for his share.

*Express or implied obligation.* Express or conventional obligations are those by which the obligor binds himself in express terms to perform his obliga-

tion, while implied obligations are such as are raised by the implication or inference of the law from the nature of the transaction.

*Failure to meet obligations.* See Failure to meet obligations.

*Joint or several obligation.* A joint obligation is one by which two or more obligors bind themselves jointly for the performance of the obligation. A several obligation is one where the obligors promise, each for himself, to fulfill the engagement.

*Moral obligation.* A duty which is valid and binding in conscience and according to natural justice, but is not recognized by the law as adequate to set in motion the machinery of justice; that is, one which rests upon ethical considerations alone, and is not imposed or enforced by positive law. A duty which would be enforceable by law, were it not for some positive rule, which, with a view to general benefit, exempts the party in that particular instance from legal liability. See also Love and affection.

*Natural or civil obligation.* A natural obligation is one which cannot be enforced by action, but which is binding on the party who makes it in conscience and according to natural justice. As, for instance, when the action is barred by the act of limitation, a natural obligation still subsists, although the civil obligation is extinguished. Ogden v. Saunders, 25 U.S. 213, 337, (12 Wheat.) 6 L.Ed. 606. A civil obligation is a legal tie, which gives the party with whom it is contracted the right of enforcing its performance by law.

*Obediential obligation.* One incumbent on parties in consequence of the situation or relationship in which they are placed.

*Perfect or imperfect obligation.* A perfect obligation is one recognized and sanctioned by positive law; one of which the fulfillment can be enforced by the aid of the law. But if the duty created by the obligation operates only on the moral sense, without being enforced by any positive law, it is called an "imperfect obligation," and creates no right of action, nor has it any legal operation. The duty of exercising gratitude, charity, and the other merely moral duties are examples of this kind of obligation. Edwards v. Kearzey, 96 U.S. 595, 600, 24 L.Ed. 793.

*Personal or heritable obligation.* An obligation is heritable when the heirs and assigns of one party may enforce the performance against the heirs of the other. It is personal when the obligor binds himself only, not his heirs or representatives. An obligation is strictly personal when none but the obligee can enforce the performance, or when it can be enforced only against the obligor. An obligation may be personal as to the obligee, and heritable as to the obligor, and it may in like manner be heritable as to the obligee, and personal as to the obligor. For the term *personal obligation*, as used in a different sense, see the next paragraph.

*Personal or real obligation.* A personal obligation is one by which the obligor binds himself to perform an act, without directly binding his property for its performance. A real obligation is one by which real estate, and not the person, is liable to the obligee for the performance.

**Constitutio** /kònstət(y)úwsh(iy)ow/. In the civil law, an imperial ordinance, decree, or constitution, distinguished from *Lex, Senatus-Consultum,* and other kinds of law and having its effect from the sole will of the emperor. An establishment or settlement. Used of controversies settled by the parties without a trial. A sum paid according to agreement.

In old English law, an ordinance or statute. A provision of a statute.

**Constitutio dotis** /kònstət(y)úwsh(iy)ow dówdəs/. Establishment of dower. (

**Constitution.** The organic and fundamental law of a nation or state, which may be written or unwritten, establishing the character and conception of its government, laying the basic principles to which its internal life is to be conformed, organizing the government, and regulating, distributing, and limiting the functions of its different departments, and prescribing the extent and manner of the exercise of sovereign powers. A charter of government deriving its whole authority from the governed. The written instrument agreed upon by the people of the Union (e.g. United States Constitution) or of a particular state, as the absolute rule of action and decision for all departments (*i.e.* branches) and officers of the government in respect to all the points covered by it, which must control until it shall be changed by the authority which established it (*i.e.* by amendment), and in opposition to which any act or ordinance of any such department or officer is null and void. The full text of the U.S. Constitution appears at the end of this dictionary.



In a more general sense, any fundamental or important law or edict; as the Novel Constitutions of Justinian; the Constitutions of Clarendon.

**Constitutional.** Consistent with the constitution; authorized by the constitution; not conflicting with any provision of the constitution or fundamental law of the state. Dependent upon a constitution, or secured or regulated by a constitution; as "constitutional monarchy," "constitutional rights."

**Constitutional alcalde.** A person of official status under Mexican law corresponding in many respects in dignity and authority to a justice of the peace under the American system of government. Tietzel v. Southwestern Const. Co., 48 N.M. 567, 154 P.2d 238, 242.

**Constitutional convention.** A duly constituted assembly of delegates or representatives of the people of a state or nation for the purpose of framing, revising, or amending its constitution. Art. V of U.S. Const. provides that a Constitutional Convention may be called on application of the Legislatures of two-thirds of the states.

**Constitutional court.** A court named or described and expressly protected by Constitution, or recognized by name or definite description in Constitution (e.g. Supreme Court, as provided for in Art. III, Sec. 1 of U.S.Const.) in contrast to legislatively created courts. Commonly referred to as "Article III" courts in reference to U.S.Const.

**Constitutional freedom.** Generic term to describe the basic freedoms guaranteed by the Constitution such as the First Amendment freedoms of religion, speech, press and assembly together with protection under due process clause of the 14th Amendment. See also Bill of rights, Constitutional liberty or freedom.

**Constitutional homestead.** A special interest in real estate which protects it from attachment, created by constitution and available to the head of the family. Ringer v. Bryne, 183 Okl. 46, 80 P.2d 212, 214.

**Constitutional law.** (1) That branch of the public law of a nation or state which treats of the organization, powers and frame of government, the distribution of political and governmental authorities and functions, the fundamental principles which are to regulate the relations of government and citizen, and which prescribes generally the plan and method according to which the public affairs of the nation or state are to be administered. (2) That department of the science of law which treats of constitutions, their establishment, construction, and interpretation, and of the validity of legal enactments as tested by the criterion of conformity to the fundamental law. (3) A constitutional law is one which is consonant to, and agrees with, the constitution; one which is not in violation of any provision of the constitution of the particular state.

**Constitutional liberty or freedom.** Such freedom as is enjoyed by the citizens of a country or state under the protection of its constitution. The aggregate of those personal, civil, and political rights of the individual which are guaranteed by the constitution and secured against invasion by the government or any of its agencies. See also Constitutional freedom.

**Constitutional limitations.** Those provisions of a constitution which restrict the legislature in the types of laws which it may enact.

**Constitutional office.** A public position or office which is created by a constitution as distinguished from a statutory office which is created by an enactment of the legislature.

**Constitutional officer.** A governmental official whose office was created by a constitution; as contrasted with an officer whose position has been created by the legislature. One whose tenure and term of office are fixed and defined by the constitution, as distinguished from the incumbents of offices created by the legislature.

**Constitutional powers.** See Power.

**Constitutional protections.** Those basic protections guaranteed by the Constitution such as due process, equal protection and the fundamental protections of the First Amendment, such as those touching speech, press and religion. See Bill of rights; Constitutional freedom.

**Constitutional questions.** Those legal issues which require an interpretation of the Constitution for their resolution as distinguished from those of a statutory nature.

**Constitutional right.** A right guaranteed to the citizens by the Constitution and so guaranteed as to prevent legislative interference therewith. See also Constitutional freedom; Constitutional liberty or freedom; Constitutional protections.

Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

Section 2.   [1]   The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

[2]   A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

[3]   No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

Section 3.   [1]   New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

[2]   The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

Section 4.   The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

ARTICLE V

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

ARTICLE VI

[1]   All Debts contracted and Engagements entered into, before the Adoption of this Constitution shall be as valid against the United States under this Constitution, as under the Confederation.

[2]   This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

[3]  The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

## ARTICLE VII

The Ratification of the Conventions of nine States shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

ARTICLES IN ADDITION TO, AND AMENDMENT OF, THE CONSTITUTION OF THE UNITED STATES OF AMERICA, PROPOSED BY CONGRESS, AND RATIFIED BY THE LEGISLATURES OF THE SEVERAL STATES PURSUANT TO THE FIFTH ARTICLE OF THE ORIGINAL CONSTITUTION.

## AMENDMENT I [1791]

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## AMENDMENT II [1791]

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

## AMENDMENT III [1791]

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

## AMENDMENT IV [1791]

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## AMENDMENT V [1791]

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## AMENDMENT VI [1791]

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him;

his jurisdiction could not assert a defense on the basis of his office. Essentially, a judge in such a case was unable to establish the elements of the defense required by the basic rule. Yet the underlying reason for this limit to the defense was the formalistic and definitional idea that a judge acted as judge only when he exercised the functions assigned to him by law. If a judge exceeded his authority, not only was his act *coram non judice*[49] and therefore void, but it was also considered the act of a private person. The recitation of this analysis in numerous cases[50] is formulaic but sensible; when the judge knowingly acted outside his jurisdiction, it would have been difficult for the law to be consistent in allowing him to assert his judicial status as a defense.

The intermediate case between erroneous judgment clearly within the jurisdiction of the court and knowing action in the absence of jurisdiction provided the opportunity to test the extent to which the law was being shaped by mechanical application of formal concepts and the extent to which it was being shaped by instrumental concern for the underlying objectives. When a judge exceeded his jurisdiction without actual or constructive knowledge of the facts that would indicate the absence of jurisdiction, the English courts at an early point permitted the judge to plead his lack of knowledge of jurisdictional facts as a valid defense. *Gwinne v. Poole*,[51] the earliest reported judicial immunity decision, is generally regarded as the seminal case for the doctrine *ignorantia facti excusat* — ignorance of the jurisdictional facts excuses the lack of jurisdiction.[52] Following *Gwinne*, there was a considerable gap before a series of nineteenth-century cases further articulated the principle and its effects.

In one such case, *Pike v. Carter*,[53] defendant was a justice of the peace who asserted jurisdiction over a dispute that was not within his jurisdiction due to a statutory exception. At the first hearing on the matter before the justice, one of the parties appeared as defendant but did not raise the exception; at a second hearing, none of the defendants appeared. When the defendants in the first case attempted to bring an action of trespass against

49. See note 37 *supra*.

50. E.g., Moravia v. Sloper, 125 Eng. Rep. 1039 (C.P. 1737); Terry v. Huntington, 145 Eng. Rep. 557 (Ex. 1668).

51. 125 Eng. Rep 523 (C.P. 1566). See note '9 *supra*.

52. Again, the Latin form retained as particularly evocative.

53. 130 Eng. Rep. 443 (C.P. 1825). See also Calder v. Halket, 13 Eng. Rep. 12 (P.C. 1840); Lowther v. Earl of Radnor, 103 Eng. Rep. 257 (K.B. 1806).

to Kobb

HIMSELF

Knowingly Acted outside of his jurisdiction

§ 455. Disqualification of justice, judge, or magistrate

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

**UNITED STATES CONSTITUTION**

to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

## AMENDMENT VII [1791]

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

*[handwritten: HARKS BACK ENGLISH COMMON LAW TO]*

## AMENDMENT VIII [1791]

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and un-usual punishments inflicted.

*[handwritten: 1618 FOR JUDGES]*

## AMENDMENT IX [1791]

*[handwritten: CORAM NON-JUDICE]*

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people. *[handwritten: AND ALLOW's]*

## AMENDMENT X [1791]

*[handwritten: DAMAGES FOR]*

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

## AMENDMENT XI [1798]

*[handwritten: PLAINTIFF]*

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of an-other State, or by Citizens or Subjects of any Foreign State.

## AMENDMENT XII [1804]

The Electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in dis-tinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;—The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;—The person having the great-est number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. But in choosing the President, the votes shall be taken by states, the representation from each state having one vote; a quorum for this purpose shall consist of a member or mem-bers from two-thirds of the states, and a majority of all the states shall be necessary to a choice. And if the House of Representatives shall not choose a President whenever the right of choice shall devolve upon them before the fourth day of March next following, then the Vice-President shall act as President, as in the case of the death or other constitutional disability of the President.—The person having the greatest number of votes as Vice-Presi-dent, shall be the Vice-President, if such number be a majority of the whole number of Electors appointed, and if no person have a majority, then from the two highest numbers on

[3] The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

*Judges Obligation of Contract By The United States*

### ARTICLE VII

The Ratification of the Conventions of nine States shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

ARTICLES IN ADDITION TO, AND AMENDMENT OF, THE CONSTITUTION OF THE UNITED STATES OF AMERICA, PROPOSED BY CONGRESS, AND RATIFIED BY THE LEGISLATURES OF THE SEVERAL STATES PURSUANT TO THE FIFTH ARTICLE OF THE ORIGINAL CONSTITUTION.

### AMENDMENT I [1791]

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

### AMENDMENT II [1791]

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

### AMENDMENT III [1791]

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

### AMENDMENT IV [1791]

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

### AMENDMENT V [1791]

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

### AMENDMENT VI [1791]

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him;

Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

Section 2.  [1]  The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

[2]  A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

[3]  No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

Section 3.  [1]  New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

[2]  The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

Section 4.  The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

## ARTICLE V

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

## ARTICLE VI

[1]  All Debts contracted and Engagements entered into, before the Adoption of this Constitution shall be as valid against the United States under this Constitution, as under the Confederation.

[2]  This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Here, in the days of the later Tudors and Stuarts in England . . . "we are plunged into talk about kings who do not die, who are never under age, who are ubiquitous, who do no wrong and (says Blackstone) think no wrong; and such talk has not been innocuous." The ancient maxim that "the King can do no wrong" took on new meaning and came to stand for a notion that the sovereign was incapable of doing wrong. This was a substantive ground of immunity in addition to the mere lack of a court with power to enforce remedies against the king.[9]

Nonetheless, the Crown never enjoyed absolute immunity from suit.[10] For example, an aggrieved subject could pursue a contract claim through a petition of right addressed to the King's Chancellor. As Chief Justice Cockburn stated in the famous case of *Feather v. The Queen:*[11]

[T]he petition of right is open to the subject . . . where the land or goods or money of a subject have found their way into the possession of the Crown, and the purpose of the petition is to obtain restitution, or if restitution cannot be given, compensation in money, or where the claim arises out of a contract, as for goods supplied to the Crown or to the public service.[12]

[9] James, Tort Liability of Governmental Units and Their Officers (1955) 22 U Chi L Rev 610, 611-12 (quoting Maitland).

[10] See Jaffe, Suits Against Governments and officers: Sovereign Immunity (Part 1) (1963) 77 Harv L Rev 1, 2-19, for a history of sovereign immunity in England.

[11] (Q.B. 1865) 6 B & S 257, 122 Eng. Rep. 1191.

[12] *Id.* at 1204. See also Thomas v. The Queen (1874) L.R. 10 Q.B. 31; Jaffe, Suits Against Governments and Officers: Sovereign Immunity (Part 1) (1963) 77 Harv L Rev 1, 5-6 (describing procedures for obtaining petitions of right); Borchard, Governmental Responsibility in Tort, VI (1926) 36 Yale LJ 1, 24-5 (same).

But petitions of right were not available for claims sounding in tort. See Feather v. The Queen (Q.B. 1865) 6 B & S 257, 122 Eng Rep 1191, 1205. "Not only is there no precedent for a petition of right being entertained in respect of a wrong in the legal sense of the term, but, if the matter is considered with reference to principle, it becomes apparent that the proceeding by petition of right cannot be resorted to by the subject in the case of a tort. For it must be borne in mind that the petition of right, unlike a petition addressed to the grace and favour of the Sovereign, is founded on the violation of some right in respect of which, but for the immunity from all process with which the law surrounds the person of the Sovereign, a suit at law or equity could be maintained."

An individual who believed that his property was in the wrongful possession of the King could also resort to the remedy of *monstrans de droit*,[13] and sometimes this remedy was available without the King's consent.[14] In addition, the King could be sued in the Court of Exchequer to recover property wrongfully claimed by the Crown or to enforce a monetary obligation upon which the Crown had defaulted. As early as 1668, the Court of Exchequer, in *Pawlett v. The Attorney General*,[15] allowed a mortgagor to recover property that had escheated to the Crown by virtue of the mortgagee's attainder of treason.[16]



While the King could not be sued for the misdeeds of his officers, his officers were not similarly protected. The Thirteenth Century saw the King's Court of Exchequer entertain suits against the Exchequer's sheriffs and bailiffs.[17] Mandamus and other prerogative writs were available to discipline the King's officers.[18] And Blackstone commented that "the prerogative of the crown" was "created for the benefit of the people" and could not "be exerted to their prejudice."[19] Thus, "evil counselors" and "wicked ministers" could be punished "by means of indictments, and parliamentary impeachments."[20] Reasoning from the ancient doctrine that the King could do no wrong, "any wrong that was done in his name was, in the eyes of the law, not done by the king at all."[21] Thus, the King's servants

[13] Jacobs, The Eleventh Amendment and Sovereign Immunity (1972) 5, n 6.

[14] Jaffe, Suits Against Governments and Officers: Sovereign Immunity (Part 1) (1963) 77 Harv L Rev 1, 6, n 10.

[15] (Ex 1668) Hadres 465, 145 Eng Rep 550.

[16] "[T]he party ought in this case to be relieved against the King, because the King is the fountain and head of justice and equity; and it shall not be presumed, that he will be defective in either. And it would derogate from the King's honour to imagine, that what is equity against a common person, should not be equity against him." 145 Eng. Rep. at 552.

See also the Bankers' Case, cited and discussed in Jaffe, Suits Against Governments and Officers: Sovereign Immunity (Part 1) (1963) 77 Harv L Rev 1, 7-8.

[17] *Id.* at 9.

[18] See Jacobs, The Eleventh Amendment and Sovereign Immunity (1972) 5; Jaffe, Suits Against Governments and Officers: Sovereign Immunity (Part 1) (1963) 77 Harv L Rev 1, 15-18.

[19] Erlich, Erlich's Blackstone (1959) 67.

[20] *Id.*

[21] Engdahl, Immunity and Accountability For Positive Governmental Wrongs (1972) 44 U Colo L Rev 1, 4.

(Rel.47-6/80   Pub.410)

The Supreme Court resolved this controversy against state sove-
reignty—at least temporarily—in *Chisholm v. Georgia.*[10] There, two
citizens of South Carolina, as executors of a British creditor, invok-
ing the Supreme Court's original jurisdiction, sued the State of
Georgia to recover a money judgment against the State on defaulted
bonds.[11] Edmund Randolph, Attorney General of the United States,
represented the plaintiff and moved for a default judgment if Geor-
gia did not appear.

The Court, over the dissent of Justice Iredell,[12] held that Georgia
was not immune from suit and that Article III's extension of judi-
cial power to suits between a state and citizens of another state
should be given its plain meaning. Thus, Chief Justice Jay rejected
an interpretation of Article III that would merely have permitted a
state to sue a citizen of another state in federal court.[13] Instead,

Framer's intent see Jacobs, The
Eleventh Amendment and Sovereign
Immunity (1972) 11-22; Field, The
Eleventh Amendment and Other
Sovereign Immunity Doctrines: Part
One (1978) 126 U Pa L Rev 515,
527-36; Mathis, The Eleventh
Amendment: Adoption and Interpre-
tation (1968) 2 Ga L Rev 207; Prin-
cipality of Monaco v. Mississippi
(1934) 292 US 313, 323-25, 54 S Ct
745, 78 L ed 1282 (where Chief Jus-
tice Hughes recounts only the pro-
immunity debates). The latter case is
discussed at ¶¶ 300.03[3.—2],
350.02[4], *infra.*

[10] (1793) 2 Dall 419, 1 L ed 440.

[11] A statement of the case ap-
pears in 1 Warren, The Supreme
Court in United States History
(1926) 93, n 1; and in Jacobs, The
Eleventh Amendment and Sovereign
Immunity (1972) 47-55.

[12] "I have now, I think, estab-
lished the following particulars. *1st*
That the Constitution, so far as it
reflects the judicial authority, can
only be carried into effect by acts of

the Legislature appointing Courts,
and prescribing their methods of
proceeding. *2d* That Congress has
provided no new law in regard to
this case, but expressly referred us
to the old. *3d* That there are no prin-
ciples of the old law, to which we
must have recourse, that in any
manner authorise the present suit,
either by precedent or by analogy.
The consequence of which, in my
opinion, clearly is, that the suit in
question cannot be maintained, nor,
of course, the motion made upon it
be complied with." 2 Dall at 449.

[13] "This extension of power is
*remedial,* because it is to settle con-
troversies. It is therefore, to be con-
strued liberally. It is politic, wise,
and good that, not only the contro-
versies, in which a State is *Plaintiff,*
but also those in which a State is *De-*
*fendant,* should be settled; both cases,
therefore, are within the reason of
the remedy; and ought to be so ad-
judged, unless the obvious, plain,
and literal sense of the words forbid
it. If we attend to the *words,* we find

(Rel.47-4/80  Pub.410)



some of the egalitarian principles that had fueled the Revolution demanded that Georgia be subject to suit by an aggrieved citizen of another state:

> The extension of the judiciary power of the *United States* to such controversies, appears to me to be *wise,* because it is *honest,* and because it is *useful.* It is *honest,* because it provides for doing justice without respect of persons, and by securing individual citizens as well as States, in their respective rights, performs the promise which every free Government makes to every free citizen, of equal justice and protection. It is *useful,* because . . . it recognizes and strongly rests on this great moral truth, that justice is the same whether due from one man or a million, or from a million to one man; because it teaches and greatly appreciates the value of our free republican national Government, which places all our citizens on an equal footing, and enables each and every of them to obtain justice without any danger of being opponents; and, because it brings into action, and enforces this great and glorious principle, that the people are the sovereign of this country, and consequently that fellow citizens and joint sovereigns cannot be degraded by appearing with each other in their own Courts to have their controversies determined.[14]

them to be express, positive, free from ambiguity, and without room for such implied expressions: '*The judicial power of the United States shall extend to controversies between a State and citizens of another State.*' If the Constitution really meant to extend these powers only to those controversies in which a State might be *Plaintiff,* to the exclusion of those in which citizens had demands against a State, it is inconceivable that it should have attempted to convey that meaning in words, not only so incompetent, but also repugnant to it; if it meant to exclude a certain class of these controversies, why were they not expressly excepted; on the contrary, not even an intimation of such intention appears in any part of the Constitution." *Id.* at 476-77.

.[14] 2 Dall at 479.

Justice James Wilson concurred:

"To the Constitution of the *United States* the term SOVEREIGN, is totally unknown. There is but one place where it could have been used with propriety. But, even in that place it would not, perhaps, have comported with the delicacy of those, who *ordained* and *established* that Constitution. They *might* have announced themselves 'SOVEREIGN' people of the *United States.* But serenely conscious of the *fact,* they avoided the *ostentatious declaration.*

". . .

"A State, like a merchant, makes a contract. A dishonest State, like a dishonest merchant, wilfully refuses to discharge it: The latter is amenable to a Court of Justice: Upon general principles of right, shall the former when summoned to answer the

(Rel.47-6/80  Pub.410)

*VALUE OF IMPAIRMENT OF obligation of contract of SEPT 28, 1850*

# Detroit casinos earn millions per day

Associated Press

DETROIT — Detroit's two temporary casinos apparently are taking in roughly $2 million a day from gamblers. And an official with the parent company of one of the gambling halls expects it to do even better as the weather warms.

MGM Grand Detroit Casino, which opened last summer, averaged revenues of about $1.1 million a day in the quarter that ended Dec. 31.

By comparison, the local MotorCity Casino on average brought in at least $800,000 a day from its Dec. 14 opening to Jan. 31, the end of the quarter for parent Mandalay Resort Group.

The revenue for both casinos includes the amount gamblers left behind at tables and slot machines, as well as at the buffet and other restaurants. But analysts say most of the revenue is from gaming.

Across the Detroit River in Ontario, Casino Windsor has not reported any revenue numbers since last fall, when that gambling hall reported an average daily take of $1.6 million.

Last month, a Casino Windsor spokesman said that site had not lost much business after the MotorCity casino opened. Bettors could be spending as much as $3.5 million each day among the three casinos, the Detroit Free Press reported.

Financial information about MotorCity came Wednesday as part of an earnings release by Las Vegas-based Mandalay Resort Group, which owns 53.5 percent of the Detroit casino. The rest is owned by Detroit-area investors who include Marian Ilitch, who also owns Little Caesars Enterprises with her husband, Detroit Tigers and Red Wings owner Mike Ilitch.

MotorCity's operating profit was $7.7 million, lower than what analysts expected, representing an operating margin of 20 percent, The Detroit News reported. By comparison, MGM Grand Detroit earned $33.4 million in the fourth quarter, with a 33-percent margin.

Glenn Schaeffer, Mandalay Resort Group's president and chief financial officer, said he expects MotorCity business to increase going forward into summer.

"That was our experience in Windsor," he said for the Mandalay group that was part of a consortium that managed Casino Windsor. "It will only get better with warmer weather."

He added: "We're on course. It's cold in Detroit in January."

Dennis Forst, a gaming analyst for McDonald Investments in Los Angeles, said the MotorCity's numbers were somewhat disappointing — but not bad given that winter is a challenging period.

**Liquidation Super Sale**
**COMPUTER SHOW**
The Most POWERFUL Show in Town
FEB. 26 & 27, SAT. & SUN., 10-5 PM
CASHMAN CENTER
860 Las Vegas Blvd. North
AMERICAN MEGA SHOWS • www.megashow.com

**EARN 13%**
You Control Your Investments
No Power of Attorney
IRA & CD Rollover Short Term
www.PacificWestMortgage.com
NV Lic #00021          (702) 892-3737



**No one has ever lost a penny.**

**EARN 11¼%**

• You get an interest check every month.
• Secured by deeds of trust.
• Short terms available.
• Extensive list of references available.
• Call for information and a free brochure.

**(702) 227-0965**

*Del Mar* MORTGAGE
2901 El Camino, Ste. 206, Las Vegas, NV 89102
www.delmarmtg.com
A Sunderland Company
On the NASDAQ: OTC-BB: DLMA

*Under Article 1, Sec 10 Cl 1. Treaty of 1819 antedated Treaty of 1848, Land Patent + of 1850. 1851*

does not, by giving its consent to a compact, relinquish or restrict
its own powers, as for example, its power to regulate interstate
commerce.[2056]

*Grants of Franchise to Corporations by Two States.*—It is
competent for a railroad corporation organized under the laws of
one State, when authorized so to do by the consent of the State
which created it, to accept authority from another State to extend
its railroad into such State and to receive a grant of powers to own
and control, by lease or purchase, railroads therein and to subject
itself to such rules and regulations as may be prescribed by the
second State. Such legislation on the part of two or more States is
not, in the absence of inhibitory legislation by Congress, regarded
as within the constitutional prohibition of agreements or compacts
between States.[2057]

*Legal Effect of Interstate Compacts.*—Whenever, by the
agreement of the States concerned and the consent of Congress, an
interstate compact comes into operation, it has the same effect as
a treaty between sovereign powers. Boundaries established by such
compacts become binding upon all citizens of the signatory States
and are conclusive as to their rights.[2058] Private rights may be af-
fected by agreements for the equitable apportionment of the water
of an interstate stream, without a judicial determination of existing
rights.[2059] Valid interstate compacts are within the protection of
the obligation of contracts clause,[2060] and a "sue and be sued" pro-
vision therein operates as a waiver of immunity from suit in fed-
eral courts otherwise afforded by the Eleventh Amendment.[2061]
The Supreme Court in the exercise of its original jurisdiction may
enforce interstate compacts following principles of general contract
law.[2062] Congress also has authority to compel compliance with

---

consent to the subsequent adoption of implementing legislation by the participating
States. De Veau v. Braisted, 363 U.S. 144, 145 (1960).
   [2056] Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. (59 U.S.) 421,
433 (1856).
   [2057] St. Louis & San Francisco Railway v. James, 161 U.S. 545, 562 (1896).
   [2058] Poole v. Fleeger, 11 Pet. (36 U.S.) 185, 209 (1837); Rhode Island v. Massa-
chusetts, 12 Pet. (37 U.S.) 657, 725 (1838).
   [2059] Hinderlider v. La Plata Co., 304 U.S. 92, 104, 106 (1938).
   [2060] Green v. Biddle, 8 Wheat. (21 U.S.) 1, 13 (1823); Virginia v. West Virginia,
246 U.S. 565 (1918). See also Pennsylvania v. Wheeling & Belmont Bridge Co., 13
How. (54 U.S.) 518, 566 (1852); Olin v. Kitzmiller, 259 U.S. 260 (1922).
   [2061] Petty v. Tennessee-Missouri Comm., 359 U.S. 275 (1959).
   [2062] Texas v. New Mexico, 482 U.S. 124 (1987). If the compact makes no provi-
sion for resolving impasse, then the Court may exercise its jurisdiction to apportion
waters of interstate streams. In doing so, however, the Court will not rewrite the
compact by ordering appointment of a third voting commissioner to serve as a tie-
breaker; rather, the Court will attempt to apply the compact to the extent that its
provisions govern the controversy. Texas v. New Mexico, 462 U.S. 554 (1983).

tive charter in Pennsylvania. A pretence, as specious as any that can be alleged on this occasion, will never be wanting on any future occasion. Those acts of the state, which have hitherto been considered as the sure anchors of privilege and of property, will become the sport of every varying gust of politicks, and will float wildly backwards and forwards on the irregular and impetuous tides of party and faction." [1890]

Furthermore, in its first important constitutional case, that of *Chisholm v. Georgia*, [1891] the Court ruled that its original jurisdiction extended to an action in assumpsit brought by a citizen of South Carolina against the State of Georgia. This construction of the federal judicial power was, to be sure, promptly repealed by the Eleventh Amendment, but without affecting the implication that the contracts protected by the Constitution included public contracts.

One important source of this diversity of opinion is to be found in that ever welling spring of constitutional doctrine in early days, the prevalence of natural law notions and the resulting vague significance of the term "law." In *Sturges v. Crowninshield*, Marshall defined the obligation of contracts as "the law which binds the parties to perform their undertaking." Whence, however, comes this law? If it comes from the State alone, which Marshall was later to deny even as to private contracts, [1892] then it is hardly possible to hold that the States' own contracts are covered by the clause, which manifestly does not create an obligation for contracts but only protects such obligation as already exists. But, if, on the other hand, the law furnishing the obligation of contracts comprises Natural Law and kindred principles, as well as law which springs from state authority, then, inasmuch as the State itself is presumably bound by such principles, the State's own obligations, so far as harmonious with them, are covered by the clause.

*Fletcher v. Peck*, [1893] has the double claim to fame in that it was the first case in which the Supreme Court held a state enactment to be in conflict with the Constitution, and also the first case to hold that the contracts clause protected public grants. By an act passed on January 7, 1795, the Georgia Legislature directed the sale to four land companies of public lands comprising most of what are now the States of Alabama and Mississippi. As soon as became known, the passage of the measure had been secured by open and wholesale bribery. So when a new legislature took over in the

[1890] 2 THE WORKS OF JAMES WILSON, R. McCloskey ed. (Cambridge: 1967), 834.
[1891] 2 Dall. (2 U.S.) 419 (1793).
[1892] Ogden v. Saunders, 12 Wheat. (25 U.S.) 213, 338 (1827).
[1893] 6 Cr. (10 U.S.) 87 (1810).

*Fletcher v Peck*

winter of 1795–1796, almost its first act was to revoke the sale made the previous year.

Meantime, however, the land companies had disposed of several millions of acres of their holdings to speculators and prospective settlers, and following the rescinding act some of these took counsel with Alexander Hamilton as to their rights. In an opinion which was undoubtedly known to the Court when it decided *Fletcher v. Peck*, Hamilton characterized the repeal as contravening "the first principles of natural justice and social policy," especially so far as it was made "to the prejudice . . . of third persons . . . innocent of the alleged fraud or corruption; . . . moreover," he added, "the Constitution of the United States, article first, section tenth, declares that no State shall pass a law impairing the obligations of contract. This must be equivalent to saying no State shall pass a law revoking, invalidating, or altering a contract. Every grant from one to another, whether the grantor be a State or an individual, is virtually a contract that the grantee shall hold and enjoy the thing granted against the grantor, and his representatives. It, therefore, appears to me that taking the terms of the Constitution in their large sense, and giving them effect according to the general spirit and policy of the provisions, the revocation of the grant by the act of the legislature of Georgia may justly be considered as contrary to the Constitution of the United States, and, therefore null. And that the courts of the United States, in cases within their jurisdiction, will be likely to pronounce it so." [1894] In the debate to which the "Yazoo Land Frauds," as they were contemporaneously known, gave rise in Congress, Hamilton's views were quoted frequently.



So far as it invoked the obligation of contracts clause, Marshall's opinion in *Fletcher v. Peck* performed two creative acts. He recognized that an obligatory contract was one still to be performed—in other words, was an executory contract, also that a grant of land was an executed contract—a conveyance. But, he asserted, every grant is attended by "an implied contract" on the part of the grantor not to claim again the thing granted. Thus, grants are brought within the category of contracts having continuing obligation and so within Article I, § 10. But the question still remained of the nature of this obligation. Marshall's answer to this can only be inferred from his statement at the end of his opinion. The State of Georgia, he says, "was restrained" from the passing of the rescinding act "either by general principles which are common to our

---

[1894] B. WRIGHT, THE CONTRACT CLAUSE OF THE CONSTITUTION (Boston: 1938), 22. Professor Wright dates Hamilton's pamphlet, 1796.

not implicated, regardless of the increase in the burden on a defendant.[1845]

## Obligation of Contracts.

*"Law" Defined.*—The term comprises statutes, constitutional provisions,[1846] municipal ordinances,[1847] and administrative regulations having the force and operation of statutes.[1848] But are judicial decisions within the clause? The abstract principle of the separation of powers, at least until recently, forbade the idea that the courts "make" law and the word "pass" in the above clause seemed to confine it to the formal and acknowledged methods of exercise of the law-making function. Accordingly, the Court has frequently said that the clause does not cover judicial decisions, however erroneous, or whatever their effect on existing contract rights.[1849] Nevertheless, there are important exceptions to this rule that are hereinafter set forth.

*Status of Judicial Decision.*—While the highest state court usually has final authority in determining the construction as well as the validity of contracts entered into under the laws of the State, and the national courts will be bound by their decision of such matters, nevertheless, for reasons that are fairly obvious, this rule does not hold when the contract is one whose obligation is alleged to have been impaired by state law.[1850] Otherwise, the chal-

[1845] Id., 44, 52. *Youngblood* upheld a Texas statute, as applied to a person committing an offense and tried before passage of the law, that authorized criminal courts to reform an improper verdict assessing a punishment not authorized by law, which had the effect of denying defendant a new trial to which he would have been previously entitled.

[1846] Dodge v. Woolsey, 18 How. (59 U.S.) 331 (1856); Ohio & M. R. Co. v. McClure, 10 Wall. (77 U.S.) 511 (1871); New Orleans Gas Co. v. Louisiana Light Co., 115 U.S. 650 (1885); Bier v. McGehee, 148 U.S. 137, 140 (1893).

[1847] New Orleans Water-Works Co. v. Rivers, 115 U.S. 674 (1885); City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1 (1898); City of Vicksburg v. Waterworks Co., 202 U.S. 453 (1906); Atlantic Coast Line v. City of Goldsboro, 232 U.S. 548 (1914); Cuyahoga Power Co. v. City of Akron, 240 U.S. 462 (1916).

[1848] Ibid.; see also Grand Trunk Ry. v. Indiana R.R. Comm., 221 U.S. 400 (1911); Appleby v. Delaney, 271 U.S. 403 (1926).

[1849] Central Land Company v. Laidley, 159 U.S. 103 (1895). See also N.O. Water-Works Co. v. La. Sugar Co., 125 U.S. 18 (1888); Hanford v. Davies, 163 U.S. 273 (1896); Ross v. Oregon, 227 U.S. 150 (1913); Detroit United Ry. v. Michigan, 242 U.S. 238 (1916); Long Sault Development Co. v. Call, 242, U.S. 272, (1916); McCoy v. Union Elevated R. Co., 247 U.S. 354 (1918); Columbia G. & E. Ry. v. South Carolina, 261 U.S. 236 (1923); Tidal Oil Co. v. Flannagan, 263 U.S. 444 (1924).

[1850] Jefferson Branch Bank v. Skelly, 1 Bl. (66 U.S.) 436, 443 (1862); Bridge Proprietors v. Hoboken Co., 1 Wall. (68 U.S.) 116, 145 (1863); Wright v. Nagle, 101 U.S. 791, 793 (1880); McGahey v. Virginia, 135 U.S. 662, 667 (1890); Scott v. McNeal, 154 U.S. 34, 35 (1894); Stearns v. Minnesota, 179 U.S. 223, 232–233 (1900); Coombes v. Getz, 285 U.S. 434, 441 (1932); Atlantic Coast Line R. Co. v. Phillips, 332 U.S. 168, 170 (1947).

which, in diverse citizenship cases, under the third Article of the Federal Constitution they were empowered to do. *Burgess v. Seligman*, 107 U.S. 20 (1883)." [1856] While doubtless this was an available explanation in 1924, the decision in 1938 in *Erie Railroad Co. v. Tompkins*, [1857] so cut down the power of the federal courts to decide diversity of citizenship cases according to their own notions of "general principles of common law" as to raise the question whether the Court will not be required eventually to put *Gelpcke* and its companions and descendants squarely on the obligation of contracts clause or else abandon them.

*"Obligation" Defined.*—A contract is analyzable into two elements: the agreement, which comes from the parties, and the obligation, which comes from the law and makes the agreement binding on the parties. The concept of obligation is an importation from the Civil Law and its appearance in the contracts clause is supposed to have been due to James Wilson, a graduate of Scottish universities and a Civilian. Actually, the term as used in the contracts clause has been rendered more or less superfluous by the doctrine that the law in force when a contract is made enters into and comprises a part of the contract itself. [1858] Hence, the Court sometimes recognizes the term in its decisions applying the clause, sometimes ignores it. In *Sturges v. Crowninshield*, [1859] Marshall defined "obligation of contract" as "the law which binds the parties to perform their agreement;" but a little later the same year he sets forth the points presented for consideration in *Dartmouth College v. Woodward*, [1860] to be: "1. Is this contract protected by the Constitution of the United States? 2. Is it impaired by the acts under which the defendant holds?" [1861] The word "obligation" undoubtedly does carry the implication that the Constitution was intended to protect only executory contracts—i.e., contracts still awaiting performance, but this implication was early rejected for a certain class of contracts, with immensely important result for the clause.

*"Impair" Defined.*—"The obligations of a contract," says Chief Justice Hughes for the Court in *Home Building & Loan Assn. v. Blaisdell*, [1862] "are impaired by a law which renders them in-

---

[1856] Tidal Oil Company v. Flanagan, 263 U.S. 444, 450, 451–452 (1924).
[1857] 304 U.S. 64 (1938).
[1858] Walker v. Whitehead, 16 Wall. (83 U.S.) 314 (1873); Wood v. Lovett, 313 U.S. 362, 370 (1941).
[1859] 4 Wheat. (17 U.S.) 122, 197 (1819); see also Curran v. Arkansas, 15 How. (56 U.S.) 304 (1854).
[1860] 4 Wheat. (17 U.S.) 518 (1819).
[1861] Id. 627.
[1862] 290 U.S. 398 (1934).

nally, the predominating opinion was negative, since as we have just seen, this law does not really come into operation until the contract has been broken. Yet it is obvious that the sanction which this law lends to contracts is extremely important—indeed, indispensable. In due course it became the accepted doctrine that that part of the law which supplies one party to a contract with a remedy if the other party does not live up to his agreement, as authoritatively interpreted, entered into the "obligation of contracts" in the constitutional sense of this term, and so might not be altered to the material weakening of existing contracts. In the Court's own words: "Nothing can be more material to the obligation than the means of enforcement. Without the remedy the contract may, indeed, in the sense of the law, be said not to exist, and its obligation to fall within the class of those moral and social duties which depend for their fulfillment wholly upon the will of the individual. The ideas of validity and remedy are inseparable . . ." [1955]

This rule was first definitely announced in 1843 in the case of *Bronson v. Kinzie*. [1956] Here, an Illinois mortgage giving the mortgagee an unrestricted power of sale in case of the mortgagor's default was involved, along with a later act of the legislature that required mortgaged premises to be sold for not less than two-thirds of the appraised value and allowed the mortgagor a year after the sale to redeem them. It was held that the statute, in altering the preexisting remedies to such an extent, violated the constitutional prohibition and hence was void. The year following a like ruling was made in the case of *McCracken v. Hayward*, [1957] as to a statutory provision that personal property should not be sold under execution for less than two-thirds of its appraised value.

But the rule illustrated by these cases does not signify that a State may make no changes in its remedial or procedural law that affect existing contracts. "Provided," the Court has said, "a substantial or efficacious remedy remains or is given, by means of which a party can enforce his rights under the contract, the Legislature may modify or change existing remedies or prescribe new modes of procedure." [1958] Thus, States are constantly remodelling their judicial systems and modes of practice unembarrassed by the obligation of contracts clause. [1959] The right of a State to abolish

---

[1955] United States ex rel. Von Hoffman v. Quincy, 4 Wall. (71 U.S.) 535, 552 (1867).

[1956] 1 How. (42 U.S.) 311 (1843).

[1957] 2 How. (43 U.S.) 608 (1844).

[1958] Oshkosh Waterworks Co. v. Oshkosh, 187 U.S. 437, 439 (1903); City & Lake Railroad v. New Orleans, 157 U.S. 219 (1895).

[1959] Antoni v. Greenhow, 107 U.S. 769 (1883).

Sec. 10—Powers Denied to the States        Cl. 1—Obligation of Contracts

imprisonment for debt was early asserted. [1960] Again, the right of a State to shorten the time for the bringing of actions has been affirmed even as to existing causes of action, but with the proviso added that a reasonable time must be left for the bringing of such actions. [1961] On the other hand, a statute which withdrew the judicial power to enforce satisfaction of a certain class of judgments by mandamus was held invalid. [1962] In the words of the Court: "Every case must be determined upon its own circumstances;" [1963] and it later added: "In all such cases the question becomes . . . one of reasonableness, and of that the legislature is primarily the judge." [1964]

There is one class of cases resulting from the doctrine that the law of remedy constitutes a part of the obligation of a contract to which a special word is due. This comprises cases in which the contracts involved were municipal bonds. While a city is from one point of view but an emanation from the government's sovereignty and an agent thereof, when it borrows money it is held to be acting in a corporate or private capacity and so to be suable on its contracts. Furthermore, as was held in the leading case of *United States ex rel. Von Hoffman v. Quincy,* [1965] "where a State has authorized a municipal corporation to contract and to exercise the

---

[1960] The right was upheld in Mason v. Haile, 12 Wheat. (25 U.S.) 370 (1827), and again in Penniman's Case, 103 U.S. 714 (1881).

[1961] McGahey v. Virginia, 135 U.S. 662 (1890).

[1962] Louisiana v. New Orleans, 102 U.S. 203 (1880).

[1963] United States ex rel. Von Hoffman v. Quincy, 4 Wall. (71 U.S.) 535, 554 (1867).

[1964] Antoni v. Greenhow, 107 U.S. 769, 775 (1883). Illustrations of changes in remedies, which have been sustained, may be seen in the following cases: Jackson v. Lamphire, 3 Pet. (28 U.S.) 280 (1830); Hawkins v. Barney's Lessee, 5 Pet. (30 U.S.) 457 (1831); Crawford v. Branch Bank of Mobile 7 How. (48 U.S.) 279 (1849); Curtis v. Whitney, 13 Wall. (80 U.S.) 68 (1872); Railroad Co. v. Hecht, 95 U.S. 168 (1877); Terry v. Anderson, 95 U.S. 628 (1877); Tennessee v. Sneed, 96 U.S. 69 (1877); South Carolina v. Gaillard, 101 U.S. 433 (1880); Louisiana v. New Orleans, 102 U.S. 203 (1880); Connecticut Mut. Life Ins. Co. v. Cushman, 108 U.S. 51 (1883); Vance v. Vance, 108 U.S. 514 (1883); Gilfillan v. Union Canal Co., 109 U.S. 401 (1883); Hill v. Merchant's Ins. Co., 134 U.S. 515 (1890); City & Lake Railroad v. New Orleans, 157 U.S. 219 (1895); Red River Valley Bank v. Craig, 181 U.S. 548 (1901); Wilson v. Standefer, 184 U.S. 399 (1902); Oshkosh Waterworks Co. v. Oshkosh, 187 U.S. 437 (1903); Waggoner v. Flack, 188 U.S. 595 (1903); Bernheimer v. Converse, 206 U.S. 516 (1907); Henley v. Myers, 215 U.S. 373 (1910); Selig v. Hamilton, 234 U.S. 652 (1914); Security Bank v. California, 263 U.S. 282 (1923); United States Mortgage Co. v. Matthews, 293 U.S. 232 (1934); McGee v. International Life Ins. Co., 355 U.S. 220 (1957).

Compare the following cases, where changes in remedies were deemed to be of such character as to interfere with substantial rights: Wilmington & Weldon R.R. v. King, 91 U.S. 3 (1875); Memphis v. United States, 97 U.S. 293 (1878); Virginia Coupon Cases (Poindexter v. Greenhow), 114 U.S. 269, 270, 298, 299 (1885); Effinger v. Kenney, 115 U.S. 566 (1885); Fisk v. Jefferson Police Jury, 116 U.S. 131 (1885); Bradley v. Lightcap, 195 U.S. 1 (1904); Bank of Minden v. Clement, 256 U.S. 126 (1921).

[1965] 4 Wall. (71 U.S.) 535, 554–555 (1867).

# Our Nation's Expansion
## In Less Than 300 Years

**1607–1802.** For well over a century after the establishment of the first successful English colony, European settlement was limited to a narrow coastal strip. But by the time the Revolutionary War ended in 1783, American pioneers had already pushed beyond the Appalachians. Eager to conclude a peace treaty, Britain granted the United States sovereignty over the massive trans-Appalachian wilderness.



**1803–1844.** In one of history's greatest bargains, the United States, aided by French fears that her Louisiana territory might fall to British arms, was able to purchase the enormous region—stretching from Louisiana in the south to present-day Montana in the north and west—for $15 million. Seven years later the United States began chipping away at Spain's Florida colony, a process completed in 1819 with the Adams-Onís Treaty. Disputes with Britain over the Canadian border from eastern Maine to the Continental Divide were peacefully settled by treaties in 1818 and 1842.



**1845–1866.** After the annexation of Texas in 1845, a border dispute with Mexico led to war with that nation. After 2 years of fighting, the Treaty of Guadalupe Hidalgo, in which Mexico ceded California and vast stretches of the Southwest to the United States, was signed (1848). Meanwhile, the dispute with Britain over control of the Oregon Country was settled in 1846, with the United States gaining sovereignty of the region south of the 49th parallel. In 1853 U.S. negotiator James Gadsden arranged the purchase of a strip of land from Mexico to provide right-of-way for a railroad.



**1867–1898.** The Civil War had hardly ended before Secretary of State William Seward opened negotiations that led to the purchase of Alaska from the Russians. Though the vast region was bought for a mere $7.2 million, many Americans considered the purchase a total waste of money and the Secretary of State was roundly mocked for his largesse with public funds. Present-day U.S. borders were achieved with the annexation of Hawaii in 1898, an event that occurred 5 years after American settlers in those islands overthrew the ancient Hawaiian monarchy and established a republic.



## Dates of Statehood

| State | Date | State | Date | State | Date | State | Date |
|---|---|---|---|---|---|---|---|
| Delaware | Dec. 7, 1787 | Vermont | Mar. 4, 1791 | Wisconsin | May 29, 1848 | Oklahoma | Nov. 16, 1907 |
| Pennsylvania | Dec. 12, 1787 | Kentucky | June 1, 1792 | California | Sep. 9, 1850 | New Mexico | Jan. 6, 1912 |
| New Jersey | Dec. 18, 1787 | Tennessee | June 1, 1796 | Minnesota | May 11, 1858 | Arizona | Feb. 14, 1912 |
| Georgia | Jan. 2, 1788 | Ohio | Mar. 1, 1803 | Oregon | Feb. 14, 1859 | Alaska | Jan. 3, 1959 |
| Connecticut | Jan. 9, 1788 | Louisiana | Apr. 30, 1812 | Kansas | Jan. 29, 1861 | Hawaii | Aug. 21, 1959 |
| Massachusetts | Feb. 6, 1788 | Indiana | Dec. 11, 1816 | West Virginia | June 20, 1863 | | |
| Maryland | Apr. 28, 1788 | Mississippi | Dec. 10, 1817 | Nevada | Oct. 31, 1864 | | |
| S. Carolina | May 23, 1788 | Illinois | Dec. 3, 1818 | Nebraska | Mar. 1, 1867 | | |
| New Hampshire | June 21, 1788 | Alabama | Dec. 14, 1819 | Colorado | Aug. 1, 1876 | | |
| Virginia | June 25, 1788 | Maine | Mar. 15, 1820 | North Dakota | Nov. 2, 1889 | | |
| New York | July 26, 1788 | Missouri | Aug. 10, 1821 | South Dakota | Nov. 2, 1889 | | |
| N. Carolina | Nov. 21, 1789 | Arkansas | June 15, 1836 | Montana | Nov. 8, 1889 | | |
| Rhode Island | May 29, 1790 | Michigan | Jan. 26, 1837 | Washington | Nov. 11, 1889 | | |
| | | Florida | Mar. 3, 1845 | Idaho | July 3, 1890 | | |
| | | Texas | Dec. 29, 1845 | Wyoming | July 10, 1890 | | |
| | | Iowa | Dec. 28, 1846 | Utah | Jan. 4, 1896 | | |

## Possessions and Other Holdings

| | | | |
|---|---|---|---|
| Navassa | 1865 | American Samoa | 1899 |
| Midway Islands | 1867 | Wake Island | 1899 |
| Guam | 1898 | Canal Zone | 1903 |
| Johnston and Sand Islands | 1898 | (Leased from Panama "in perpetuity") | |
| Puerto Rico | 1898 | Palmyra Island | 1912 |
| (Commonwealth status since 1952) | | Virgin Islands of the U.S. | 1917 |
| | | Kingman Reef | 1922 |
| | | Baker Island | 1936 |
| | | Howland Island | 1936 |
| | | Jarvis Island | 1936 |
| | | Micronesia | 1947 |
| | | (U.N. Trust Territory) | |

75

*TREATY OF 1848 ANTEDATED TO INCLUDE ALL PRIOR TREATYS?*

*[handwritten: Subject to TREATY OF 1819]*

aken as
:judiced

though
ney too

:s Maj-.
Poland,
d have

of Feb-
2.

:TESERG
SCH

# TREATY OF PARIS

## Paris, September 3, 1783

*Peace Treaty between Great Britain and the United States of America.*

*[handwritten: TREATY IS CONTRACT]*

*[handwritten: HARKS BACK ENGLISH COMMON LAW to 16.18]*

*[handwritten: EXCEPT FOR TREATY OF 1819 which HARKS BACK TO 1492]*

*In the name of the Most Holy and Undivided Trinity.*

It having pleased the Divine Providence to dispose the hearts of the most serene and most potent Prince George the Third, by the Grace of God King of Great Britain, France, and Ireland, Defender of the Faith, Duke of Brunswick and Luneburg, Arch-Treasurer and Prince Elector of the Holy Roman Empire, &ca., and of the United States of America, to forget all past misunderstandings and differences that have unhappily interrupted the good correspondence and friendship which they mutually wish to restore; and to establish such a beneficial and satisfactory intercourse between the two countries, upon the ground of reciprocal advantages and mutual convenience, as may promote and secure to both perpetual peace and harmony: And having for this desirable end already laid the foundation of peace and reconciliation, by the provisional articles, signed at Paris, on the 30th of Nov'r, 1782, by the commissioners empowered on each part, which articles were agreed to be inserted in and to constitute the treaty of peace proposed to be concluded between the Crown of Great Britain and the said United States, but which treaty was not to be concluded until terms of peace should be agreed upon between Great Britain and France, and His Britannic Majesty should be ready to conclude such treaty accordingly; and the treaty

[345]

*[handwritten: Through III Article III, Article VII, Article I]*

P.28

*[handwritten upside down: 561 555 7334]*

# The Federalist No. 43
## [42]

### JAMES MADISON

January 23, 1788

*To the People of the State of New York.*

THE *fourth* class comprises the following miscellaneous powers.

1. A power "to promote the progress of science and useful arts, by securing for a limited time, to authors and inventors, the exclusive right, to their respective writings and discoveries."

The utility of this power will scarcely be questioned. The copy right of authors has been solemnly adjudged in Great Britain to be a right at common law. The right to useful inventions, seems with equal reason to belong to the inventors. The public good fully coincides in both cases, with the claims of individuals. The States cannot separately make effectual provision for either of the cases, and most of them have anticipated the decision of this point, by laws passed at the instance of Congress.

2. "To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may by cession of particular States and the acceptance of Congress, become the seat of the Government of the United States; and to exercise like authority over all places purchased by the consent of the Legislature of the States, in which the same shall be, for the erection of forts, magazines, arsenals, dockyards and other needful buildings."

The indispensible necessity of compleat authority at the seat of Government carries its own evidence with it. It is a power exercised by every Legislature of the Union, I might say

From *The Independent Journal*, January 23, 1788. This essay appeared on January 25 in both *The New-York Packet* and *The Daily Advertiser*. It was numbered 43 in the McLean edition and 42 in the newspapers.

of the w
not only
ceedings
the meml
hending t
ercise of
imputatic
Governm
confedera
gradual a
residence
pledge to
ate so ma
further t
of this f
every jeal
priated to
State will
the consei
find suffice
to the ce
of the G
as a muni
own suffr
thority of
of the cei
from the
Constitut

The i
establishe
public m
deposited
the autho
for the p

# University of Pennsylvania
# Law Review

### FOUNDED 1852

### Formerly
### American Law Register

| Vol. 133 | July 1985 | No. 6 |

## ORIGINS OF FEDERAL COMMON LAW: PART TWO[*]

### STEWART JAY[†]

Thomas Jefferson wrote Edmund Randolph in August 1799 of the need "to portray at full length the consequences of this new doctrine, that the common law is the law of the US, & that their courts have, of course, jurisdiction co-extensive with that law, that is to say, general over all cases & persons."[1] Closing the letter in the next line, he remarked, "But, great heavens! Who could have conceived in 1789 that within ten years we should have to combat such wind-mills."[2] Somewhat more than a year later, John Marshall commented in a private correspondence:

> In political controversy it often happens that the precise opinion of the adversary is not understood, & that we are at much labor to disprove propositions which have never been maintained. A stronger evidence of this cannot I think be given than the manner in which the references to the common law have been treated.[3]

---

[*] Copyright 1985 by Stewart Jay. All rights reserved.

[*] Part One of this essay appears at 133 U. PA. L. REV. 1003 (1985) [hereinafter cited as Jay, *Part One*].

[†] Associate Professor of Law, University of Washington.

[1] Letter from Thomas Jefferson to Edmund Randolph (Aug. 23, 1799), *reprinted in* 9 THE WORKS OF THOMAS JEFFERSON 76 (P. Ford ed. 1905).

[2] *Id.* at 76-77.

[3] Letter from John Marshall to St. George Tucker (Nov. 27, 1800), *reprinted in* Appendix A, *infra.*

decided, since that case accomplished a wholesale revision of established doctrine.

The analysis in *Erie* had two aspects. The first was an interpretation of section 34 of the 1789 Judiciary Act.[413] Based on Charles Warren's study, the Court concluded

> that the purpose of the section was merely to make certain that, in all matters except those in which some federal law is controlling, the federal courts exercising jurisdiction in diversity of citizenship cases would apply as their rules of decision the law of the State, unwritten as well as written.[414]

Failure to follow this dictate, the Court concluded, had led to the "mischievous results" of forum shopping and unequal administration of the laws.[415]

A second aspect of *Erie* was the constitutional dimension discussed above: federal courts have no authority to intrude upon areas of lawmaking, whether common or statutory, reserved to the states. "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."[416]

Warren surely was right in concluding that section 34 had been intended to apply to both statutory and common law. No fancy textual analysis was needed to prove the point. Federal courts long before *Swift* honored established interpretations of local common law, just as they followed settled constructions of state statutes.[417] *Swift* did no more than recite the accepted understanding of this procedure, with which section 34 was thought to be consistent. There was no concept of a federal general common law at the time of *Swift*. Throughout the nineteenth century, matters that *Erie* would place under that heading were ordinarily referred to as *state* law.[418] *Swift* addressed the occasions on which this law related to "questions of a more general nature," including the construction of ordinary contracts and issues of general commercial law, as to which

> the state tribunals are called upon to perform the like functions as ourselves, that is, to ascertain upon general reasoning and legal analogies, what is the true exposition of the

---

[413] Judiciary Act of 1789, ch. 20, § 34, 1 Stat. 73, 92 (current version at 28 U.S.C. § 1652 (1982)).

[414] 304 U.S. at 72-73 (citing Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 HARV. L. REV. 49 (1923)).

[415] 304 U.S. at 74-77.

[416] *Id.* at 78.

[417] *See supra* text accompanying notes 184-85.

[418] *See supra* text accompanying notes 180-85.

## COPYRIGHTS AND PATENTS

### Scope of the Power

This clause is the foundation upon which the national patent and copyright laws rest, although it uses neither of those terms. So far as patents are concerned, modern legislation harks back to the Statute of Monopolies of 1624, whereby Parliament endowed inventors with the sole right to their inventions for fourteen years.[1331] Copyright law, in turn, traces back to the English Statute of 1710, which secured to authors of books the sole right of publishing them for designated periods.[1332] Congress was not vested by this clause, however, with anything akin to the royal prerogative in the creation and bestowal of monopolistic privileges.[1333] Its power is limited with regard both to subject matter and to the purpose and duration of the rights granted. Only the writings and discoveries of authors and inventors may be protected, and then only to the end of promoting science and the useful arts.[1334] The concept of originality is central to copyright, and it is a constitutional requirement Congress may not exceed.[1335] While Congress may grant exclusive rights only for a limited period, it may extend the term upon the expiration of the period originally specified, and in so doing may protect the rights of purchasers and assignees.[1336] The copyright and patent laws do not have, of their own force, any extraterritorial operation.[1337]

[1331] Pennock v. Dialogue, 2 Pet. (27 U.S.) 1, 17, 18 (1829).
[1332] Wheaton v. Peters, 8 Pet. (33 U.S.) 591, 656, 658 (1834).
[1333] Cf. Graham v. John Deere Co., 383 U.S. 1, 5, 9 (1966).
[1334] Kendall v. Winsor, 21 How. (62 U.S.) 322, 328 (1859); A. & P. Co. v. Super-market Equipment Corp., 340 U.S. 147 (1950).
[1335] Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340 (1991) (publisher of telephone directory, consisting of white pages and yellow pages, not entitled to copyright in white pages, which are only compilations). "To qualify for copyright protection, a work must be original to the author. . . . Originality, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses some minimal degree of creativity. . . . To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice." Id., 345. First clearly articulated in The Trade Mark Cases, 100 U.S. 82, 94 (1879), and Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58–60 (1884), the requirement is expressed in nearly every copyright opinion, but its forceful iteration in Feist was noteworthy, because originality is a statutory requirement as well, 17 U.S.C. § 102(a), and it was unnecessary to discuss the concept in constitutional terms.
[1336] Evans v. Jordan, 9 Cr. (13 U.S.) 199 (1815); Bloomer v. McQuewan, 14 How. (55 U.S.) 539, 548 (1852); Bloomer v. Millinger, 1 Wall. (68 U.S.) 340, 350 (1864); Eunson v. Dodge, 18 Wall. (85 U.S.) 414, 416 (1873).
[1337] Brown v. Duchesne, 19 How. (60 U.S.) 183, 195 (1857). It is, however, the ultimate objective of many nations, including the United States, to develop a system of patent issuance and enforcement which transcends national boundaries; it has been recommended, therefore, that United States policy should be to harmonize its patent system with that of foreign countries so long as such measures do not dimin-

other than a product made by a single person. The prime
function of such marks was to trace defective merchandise
back to the workman, not to prevent buyer confusion. But
what was once a device for fixing responsibility on the shoddy
workman or for establishing a claim to shipwrecked goods,
was the progenitor of today's multi-billion dollar advertising
business.[5]

A similar purpose appears early in the American experi-
ence. In 1791 sailcloth-maker Samuel Breck and others
petitioned Thomas Jefferson, then Secretary of State, for the
exclusive privilege of using particular marks for designating
the "cloth of their manufacture." Jefferson replied that it
would, in his opinion, "contribute to fidelity in the execution of
manufacturers, to secure to every manufactory, an exclusive
right to mark its wares."[6]

## § 5.02    Development of Trademarks in Anglo-
             American Common Law.

Compared to the development of Anglo-American property
law, the law of trademarks and unfair competition is a relative
newcomer on the legal scene. Peering into the mists of seven-
teenth and eighteenth century English legal history, only a
few trademark cases are found. Sometime prior to 1618, a
cloth-maker was held to have a cause of action against a com-
petitor who copied plaintiff's mark and placed it on
defendant's own shoddy merchandise.[1] The first use of the
term "unfair competition" apparently was by Lord Eldon in
1803.[2]

Beginning in about 1803, English and American common
law slowly developed an offshoot of the tort of fraud and deceit
and called it "passing off" or "palming off." Simply stated,

[5] Currie, "Forward to Symposium Trademarks in Transition," 14 Law &
Contemp. Probs. (1949).
[6] III *Writings of Thomas Jefferson*, 157 (A.E. Bergh ed. 1907). *See* Patti-
shall, "The Constitutional Foundations of American Trademark Law," 78
Trademark Rep. 456 (1988).
[1] *See* Southern v. How, Popham 143, 79 Eng. Reprint 1243 (1618).
[2] Hogg v. Kirby, 8 Ves J. 215, 32 Eng. Reprint 336 (1803).

REPORTS

OF

CASES ARGUED AND ADJUDGED

IN

# THE SUPREME COURT

OF

THE UNITED STATES.

JANUARY TERM 1829

BY RICHARD PETERS,

COUNSELLOR AT LAW AND REPORTER OF THE DECISIONS OF THE SUPREME COURT OF
THE UNITED STATES.

VOL. II.

Philadelphia:
P. H. NICKLIN & T. JOHNSON, LAW BOOKSELLERS.
1829.

English
Common Law
Invention
Protection
Harks back
to 1624
through
Treaty of
1783
Art VI

W LIBRARY
0062.4236

hundred or more slaves. Taverns, billiard parlors, barbershops, butcher shops, and stores dominated the commercial establishments in town, while several sawmills, a brickyard, and a tannery existed on the city's periphery.

The most popular sport for the men was billiards. Dancing and gambling were also popular pastimes. The Tivoli dance hall — later the Hotel de Paris owned by Francisco Moreno — also had rooms for card-playing and gaming. From all accounts, Pensacolans loved to gamble. This was the Pensacola in which Francisco Moreno lived and raised his families.

For several years, Francisco apparently farmed the large tract of land given to him and Fernando in 1810. In 1815, he married Doña Josefa López, the legitimate daughter of Don Joseph Anthony López, by then deceased, and Doña María Victoria Calder. In the same year, Josefa gave birth to a daughter, Angela. In 1817, a son, Francisco Jr. was born and the following year a daughter, Josefa, appeared. Unfortunately, both Francisco's wife and daughter, the two Josefas, died in 1820. Thus only two of Francisco's children, who were born before July 17, 1821 (the date Andrew Jackson accepted the transfer of Spanish West Florida to the United States), survived the Spanish era in Pensacola history. However, Francisco married twice after his first wife's death. He married her sister, Margarita Eleutaria, who bore twelve children between 1822 and 1851, when she died. He then married seventeen-year-old Mentoria González in 1852, and she gave birth to twelve more children between 1853 and 1873. Eight of Francisco's twenty-seven children died young. That left nineteen of them to reach adulthood.

It is difficult to separate fact from fiction about Don Francisco. It is said that about 1828, Francisco and his brother Fernando sold their 800 arpents of land near Fort San Carlos de Barrancas to the U.S. government for $3,000. The land became a part of the U.S. Navy Yard and is a part of the Pensacola Naval Air Station to this day. Francisco apparently used his share of the money to become Pensacola's first banker. He kept his money in a chest that he hid under his bed. When he made a loan, the money — supposedly only gold — came from this chest. The chest is now on display in the Moreno room of the Walton House in Pensacola. He also bought and sold large amounts of land in and around Pensacola. He may have opened the first hotel in the city, the Hôtel de Paris. In 1836, he became the Spanish consul for Pensacola, a post he held until the end of the Civil War. He also owned a number of slaves: in 1850, he owned twenty-one slaves; in 1860, he owned thirty slaves. After emancipation, three of the slaves elected to remain with the Moreno family — Old Mose, Uncle Dick, and Teresa. Francisco's social and financial status was such that he was often referred to as the King of Pensacola.

Thirteen of Francisco's sons, sons-in-law, and grandsons served the Confederate cause. Two were killed in combat: Lieutenant Francisco

CASINO GAMBLING AND NO ZONING ARE CUSTOMS, LAW, USAGES OF SPAIN AND MEXICO

*East and west Florida.*

United States be, and he is hereby, authorized to take possession of, and occupy, the territories of east and west Florida, and the appendages and appurtenances thereof; and to remove and transport the officers and soldiers of the king of Spain, being there, to the Havanna, agreeably to the stipulations of the treaty between the United States and Spain, concluded at Washington, on the twenty-second day of February, in the year one thousand eight hundred and nineteen, providing for the cession

*And remove Spanish troops, according to treaty.*

contract, stipulating for some future legislation, they are not necessarily so. They may import that "they shall be ratified and confirmed" by force of the instrument itself. When it is observed that in the counterpart of the same treaty, executed at the same time, by the same parties, they are used in this sense, the construction is proper, if not unavoidable. *Ibid.*

In the case of Foster and Elam v. Neilson, 2 Peters, 253, the Supreme Court considered those words importing a contract. The Spanish part of the treaty was not then brought into view, and it was then supposed there was no variance between them. It was not supposed that there was even a formal difference of expression in the same instrument, drawn up in the language of each party. Had this circumstance been known, it is believed it would have produced the construction which is now given to the article. *Ibid.*

By the law of nations, the inhabitants, citizens, or subjects of a conquered or ceded country, territory, or province, retain all the rights of property which have not been taken from them by the orders of the conqueror; and this is the rule by which we must test its efficacy according to the act of Congress, which we must consider as of binding authority. United States v. Clarke, 9 Peters, 168.

A treaty of cession is a deed or grant by one sovereign to another, which transferred nothing to which he had no right of property; and only such right as he owned, and could convey to the grantee. By the treaty with Spain, the United States acquired no lands in Florida to which any person had lawfully obtained such a right, by a perfect or inchoate title, that this court could consider it as property under the second article; or which had, according to the stipulations of the eighth article of the treaty, been granted by the lawful authorities of the king; which words, grants, or concessions, were to be construed in their broadest sense, so as to comprehend all lawful acts which operated to transfer a right of property, perfect or imperfect. *Ibid.*

The effect of the clauses of the confirmation of grants made was, that they confirmed them presently on the ratification of the treaty, to those in possession of the lands; which was declared to be, that legal seisin and possession which follows title, is co-extensive with the right, and continues till it is ousted by an actual adverse possession, as contradistinguished from residence and occupation. *Ibid.*

The United States, by accepting the cession under the terms of the eighth article, and the ratification by the king, with an exception of the three annulled grants to Allegon, Punon Rostro, and Vargas, can make no other exceptions of grants made by the lawful authorities of the king. *Ibid.*

The meaning of the words lawful authorities, in the eighth article, or competent authorities in the ratification, must be taken to be, "by those persons who exercised the granting power by the authority of the crown." The eighth article expressly recognises the existence of these lawful authorities in the ceded territories, designating the governor or intendant, as the case might be, as invested with such authority; which is to be deemed competent till the contrary is made to appear. *Ibid.*

By "the laws of Spain" is to be understood the will of the king expressed in his orders, or by his authority, evidenced by the acts themselves; or by such usage and customs in the province as may be presumed to have emanated from the king, or to have been sanctioned by him, as existing authorized local laws. *Ibid.*

In addition to the established principles heretofore laid down by this court as the legal effect of an usage or custom, there is one which is peculiarly appropriate to this case. The act of Congress giving jurisdiction to this court to adjudicate on these causes, contains this clause in reference to grants, &c., "which was protected and secured by the treaty, and which might have been perfected into a complete title, under and in conformity to the laws, usages and customs of the government under which the same originated." This is an express recognition of any known and established usage or custom in the Spanish provinces, in relation to the grants of land, and the title thereto, which brings them within a well established rule of law: that a custom or usage, saved and preserved by a statute, has the force of an express statute, and shall control all affirmative statutes in opposition, though it must yield to the authority of negative ones, which forbid an act authorized by a custom or usage thus saved and protected; and this is the rule by which its efficacy must be tested, according to the act of Congress, which must be considered of binding authority. *Ibid.*

By the eighth article of the treaty ceding Florida to the United States, the same time is allowed to the owners of land granted under the authority of Spain, to fulfil the conditions of their grants, after the date of the treaty as was limited in the grants. It has been decided by this court, in the case of Arredondo, that as to individual rights, the treaty is to be considered as dated at its ratification. United States v. Sibbald, 10 Peters, 312.

It has been decided, in Arredondo's case, that that provision of the treaty as to the performance of the conditions in grants, is not confined to owners of land by occupancy or residence; but extends to persons who have a legal seisin and possession of land, in virtue of a grant; and that, in the situation of the province, and the claimants to land at the time of the cession, it was enough that they should show a performance of the condition cy pres. *Ibid.*

In the construction of the Florida treaty, it is admitted that the United States succeeds to all those equitable obligations which we are to suppose would have influenced his Catholic majesty, to secure their property to his subjects, and which would have been applied by him in the construction of a conditional grant, to make it absolute; and further, that the United States must maintain the rights of property under it, by applying the laws and customs by which those rights were secured, before Florida was ceded; or by which an inchoate right of property would, by those laws and customs, have been adjudicated by the Spanish authority to have become a perfect right. United States v. Mills' Heirs, 12 Peters, 215.

CUSTOMS, LAWS, OF SPAIN AND MEXICO ARE PRESERVED THROUGH ART I, 10 ART. III CL. 2 A[illegible]

*ANTEDATED TO RATIFY*
*SPANISH & MEXICO IMMGRANT*

*& USE*

## TREATY OF GUADALUPE HIDALGO

### Guadalupe Hidalgo, February 2, 1848

*Peace Treaty between the United States of America and the Republic of Mexico.*

*RIGHTS ARE NOT OWNED BY DEFENDANT*  *LAND'S PATENT'S ARE SUBJECT TO THIS TREAT*

*All Florida Property IS Subject To Treaty*

In the name of Almighty God:

The United States of America and the United Mexican States, animated by a sincere desire to put an end to the calamities of the war which unhappily exists between the two Republics, and to establish upon a solid basis relations of peace and friendship, which shall confer reciprocal benefits upon the citizens of both, and assure the concord, harmony, and mutual confidence wherein the two peoples should live, as good neighbours, have for that purpose appointed their respective plenipotentiaries, that is to say:

The President of the United States has appointed Nicholas P. Trist, a citizen of the United States, and the President of the Mexican Republic has appointed Don Luis Gonzaga Cuevas, Don Bernardo Couto, and Don Miguel Atristain, citizens of the said Republic;

Who, after a reciprocal communication of their respective full powers, have, under the protection of Almighty God, the author of peace, arranged, agreed upon, and signed the following Treaty of Peace, Friendship, Limits, and Settlement between the United States of America and the Mexican Republic.

*OF 1819 AND → All FLORIDA PROPERTY IS Subject TO THIS TREATY*



parties at the time the instrument was executed is admissible in interpreting it.[19] If the description indicates the boundaries of the land granted such boundaries will control a recital as to the quantity of land included in the grant.[71] When the government grants land for a consideration, and does not reserve any rights or interests that would ordinarily pass by the rules of law, and does no act which indicates an intention to make such reservation, the grant includes all that would pass by it if it were a private grant.[72]

§ 2711. Conclusiveness of patents.—The issuance of a patent to lands over which the land department has jurisdiction as a quasi judicial tribunal is both a judgment and a conveyance,[72a] and is impervious to collateral attack.[73] The patent is conclusive in a court of law as to matters within the jurisdiction of the land department[74] as to the character of the land conveyed,[75] as to the description of the land,[76] and the extent of the right passing under the grant.[77] The recitals in a patent are evidence against all persons claiming under it or by title arising or originating subsequent to it.[78]

[70] Mulford v. LeFranc, 26 Cal. 88; Adams v. Frothingham, J Mass. 352, 3 Am. Dec. 151; Kanne v. Otty, 25 Ore. 531, 36 Pac. 537.
[71] Stein v. Ashby, 24 Ala. 521.
[72] LeMarchel v. Tegarden, 152 Fed. 662; Paterson v. Ogden, 141 Cal. 43, 74 Pac. 443, 99 Am. St. 31.
[72a] LeMarchel v. Tegarden, 152 Fed. 662; Paterson v. Ogden, 141 Cal. 43, 74 Pac. 443, 99 Am. St. 31.
[73] LeMarchel v. Tegarden, 152 Fed. 662; Thompson v. Los Angeles Farming & Milling Co., 180 U. S. 72, 45 L. ed. 432, 21 Sup. Ct. 289; Priest v. Las Vegas 232 U. S. 604, 58 L. ed. 751, 34 Sup. Ct. 443; Burke v. Southern Pac. R. Co., 234 U. S. 669, 58 L. ed. 1527, 34 Sup. Ct. 907; Phillips v. Carter, 135 Cal. 604, 67 Pac. 1031, 87 Am. St. 152; Cheever v. Horner, 11 Colo. 68, 17 Pac. 495, 7 Am. St. 217; Churvin v. Louisiana Oyster Commission, 121 La. 10, 46 So. 38; Frank v. Goddin, 193 Mo. 390, 91 S. W. 1057, 112 Am. St. 493; New York

Cent. &c. H. R. R. Co. v. Aldridge, 135 N. Y. 83, 32 N. E. 50, 17 L. R. A. 516; Board of Education v. Mansfield, 17 S. Dak. 72, 95 N. W. 286, 106 Am. St. 771.
[74] Witcomb v. White, 214 U. S. 15, 53 L. ed. 889, 29 Sup. Ct. 599; Plested v. Abbey, 228 U. S. 42, 57 L. ed. 724, 33 Sup. Ct. 503; Daniels v. Wagner, 237 U. S. 547, 59 L. ed. 1102, 35 Sup. Ct. 740, L. R. A. 1916A, 1116, Ann. Cas. 1917A, 40; Krabe v. Borden, 33 Ala. 436, 7 So. 92; Gage v. Gunther, 136 Cal. 338, 68 Pac. 710, 89 Am. St. 141; German Ins. Co. v. Hayden, 21 Colo. 127, 40 Pac. 453, 52 Am. St. 206.
[75] Paterson v. Ogden, 141 Cal. 43, 74 Pac. 443, 99 Am. St. 31.
[76] Miller v. Grunsky, 141 Cal. 441, 66 Pac. 858, 75 Pac. 48.
[77] Barringer v. Davis (Iowa), 112 N. W. 208.
[78] Bachop v. Critchlow, 142 Pa. St. 518, 21 Atl. 984.

863

*[handwritten: IT HAS NO Sovereign power claim to zone]*

*[left column, partial text from binding edge]*

ı for consideration.
'resist successfully
posing of the prop-
Jo not claim the fee,
, therefore, they do
:ction B as persons
of any right or title
:an government,' it
to permanent occu-
·effect, and it could
re burdened with a
a part of the public
·osal of the United
d have little reason
n his claim to land,
laim, if the only re-
im, burdened by an
:." *Id.* at 491–492.

:er in a subsequent
·which the Indians
derived from Span-
:inguished by some
*States v. Title Ins.*
:hough it was sug-
:ecognized such an
ı *United States* v.
o. 358, pp. 14–16;
'9 (1854), the Court
because the Indians
:imespan established
ıpancy was barred.
rule its decision in
such a decision on
:rence to a settled

*[main column]*

Finally, in *United States v. Coronado Beach Co.*, 255 U. S. 472 (1921), the Government argued that even if the land-owner had been awarded title to tidelands by reason of a Mexican grant, a condemnation award should be reduced to reflect the interest of the State in the tidelands which it acquired when it entered the Union. The Court expressly rejected the Government's argument, holding that the patent proceedings were conclusive on this issue, and could not be collaterally attacked by the Government. *Id.*, at 487–488. The necessary result of the *Coronado Beach* decision is that even "sovereign" claims such as those raised by the State of California in the present case must, like other claims, be asserted in the patent proceedings or be barred.

These decisions control the outcome of this case. We hold that California cannot at this late date assert its public trust easement over petitioner's property, when petitioner's predecessors-in-interest had their interest confirmed without any mention of such an easement in proceedings taken pursuant to the Act of 1851. The interest claimed by California is one of such substantial magnitude that regardless of the fact that the claim is asserted by the State in its sovereign capacity, this interest, like the Indian claims made in *Barker* and in *United States v. Title Ins. & Trust Co.*, must have been presented in the patent proceeding or be barred. Accordingly, the judgment of the Supreme Court of California is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL took no part in the decision of this case.

*[handwritten annotations: NO POWER TO ZONE THE PROPERTY PUBLIC TRUST EASEMENT]*

*[handwritten: INDIAN CLAIMS BARRED]*

*[handwritten: Specific claim not answered by defendant's]*

*[handwritten: "EVEN" "SOVEREIGN" CLAIMS MUST BE ASSERTED IN THE PATENT PROCEEDING OR BE BARRED]*

SUMMA CORP. v. CALIFORNIA ex rel. LANDS COMM'N   203

198   466 US 203, 209   Opinion of the Court

466 U. S.

: land in Marina
can Governor of
o Machado and
own as the Ran-
cho Ballona be-
var between the
lly ended by the
st. 922.  Under
algo the United
ghts of Mexican
rt. VIII, 9 Stat.
; into California
th and other re-
ts encompassed
ncluded some of
R. Rep. No. 1,
ote long ago:

(1879); *Fremont v.*
necessary to deter-
easement on grants

dly 14,000 acres and
l boundaries.  The
sins of the former
itions transforming
rga respondent Les
dly what remains of
: ranch the State's
d no longer subject
came a State.  See
d 423 (1970).
process that began
Their petition was
committee on vacant
ook place after the
dated walking the
ered.  See gener-
) (1867).

"The country was new, and rich in mineral wealth, and
attracted settlers, whose industry and enterprise pro-
duced an unparalleled state of prosperity.  The en-
hanced value given to the whole surface of the country
by the discovery of gold, made it necessary to ascertain
and settle all private land claims, so that the real estate
belonging to individuals could be separated from the
public domain."  *Peralta v. United States*, 3 Wall. 434,
439 (1866).

See also *Botiller v. Dominguez*, 130 U. S. 238, 244 (1889).
To fulfill its obligations under the Treaty of Guadalupe
Hidalgo and to provide for an orderly settlement of Mexi-
can land claims, Congress passed the Act of March 3, 1851,
setting up a comprehensive claims settlement procedure.
Under the terms of the Act, a Board of Land Commissioners
was established with the power to decide the rights of "each
and every person claiming lands in California by virtue of any
right or title derived from the Spanish or Mexican govern-
ment . . . ."  Act of Mar. 3, 1851, §8, ch. 41, 9 Stat. 632.
The Board was to decide the validity of any claim according
to "the laws, usages, and customs" of Mexico, §11, while par-
ties before the Board had the right to appeal to the District
Court for a *de novo* determination of their rights, §9; *Grisar
v. McDowell*, 6 Wall. 363, 375 (1868), and to appeal to this
Court, §10.  Claimants were required to present their claims
within two years, however, or have their claims barred.
§13; see *Botiller v. Dominguez, supra.*  The final decree
of the Board, or any patent issued under the Act, was also a
conclusive adjudication of the rights of the claimant as against
the United States, but not against the interests of third par-
ties with superior titles.  §15.

In 1852 the Machados and the Talamantes petitioned the
Board for confirmation of their title under the Act.  Follow-
ing a hearing, the petition was granted by the Board, App.
21, and affirmed by the United States District Court on ap-

*[handwritten annotations: "LAWS OF MEXICO SPAIN AND THE U.S. NOT THE U.S."]*

*[handwritten annotation: "MEXICO INCLUDES NO ZONING AND CASINO GAMBLING AS CUSTOMS LAW"]*

UNITED STATES CONSTITUTION                                          1494

[17] To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;—And

[18] To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

Section 9. [1] The Migration or Importation of Such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.

[2] The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.

[3] No Bill of Attainder or ex post facto Law shall be passed.

[4] No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.

[5] No Tax or Duty shall be laid on Articles exported from any State.

[6] No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another; nor shall Vessels bound to, or from, one State be obliged to enter, clear, or pay Duties in another.

[7] No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

[8] No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

Section 10. [1] No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

[2] No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.

[3] No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

ARTICLE II

Section 1. [1] The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows:

[2] Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which

Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

[3] The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

Section 3. He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

Section 4. The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

## ARTICLE III

Section 1. The Judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office.

Section 2. [1] The Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under the Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

[2] In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

[3] The trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

Section 3. [1] Treason against the United States, shall consist only in levying War against them, or, in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

[2] The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

## ARTICLE IV

Section 1. Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general

1497                                    UNITED STATES CONSTITUTION

Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

Section 2. [1] The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

[2] A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

[3] No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

Section 3. [1] New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

[2] The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

Section 4. The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.


ARTICLE V

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

*[handwritten: TREATY CONTRACT]*

ARTICLE VI

*[handwritten: HARKS BACK ENGLISH COMMON LAW to 1618 SPANISH COMMON LAW to 1492 AS SUPREME LAW OF PROPERTY]*

[1] All Debts contracted and Engagements entered into, before the Adoption of this Constitution shall be as valid against the United States under this Constitution, as under the Confederation.

[2] This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

*[handwritten: NO ZONING, CASINO GAMBLING SUPREME LAW]*

ISBN 1-56164-003-4 *24.95

# Spanish Pathways in Florida

### Ann L. Henderson and Gary R. Mormino, Editors

Translated by Carlos J. Cano,
José Feliciano-Butler and Warren Hampton

&

This book, in celebration of the
Quincentenary of Columbus's voyage to
America, offers, in both Spanish and
English, essays on the influence of the
Spanish in Florida, from the first
explorers to the latest Hispanic migra-
tions into Miami. You will learn more
about the influence of well-known
Spaniards like Hernando de Soto and
Pedro Menéndez de Avilés, and you will
encounter, very likely for the first time,
lesser known but influential Spaniards
like Thomas Menéndez Márquez and
Father Juan de Paiva. From the Moreno
family of Pensacola, to José Martí in
Tampa, to Mario Sánchez of both Tampa
and Key West, to Francis Xavier Sánchez
of St. Augustine, to Maurice Ferré and
Xavier Suárez of Miami, Spaniards and
their descendants have influenced every
part of Florida.

Gary R. Mormino is a professor of
history at the University of South Florida
and author of two award-winning books,
*Immigrants on the Hill* and *The Immi-
grant World of Ybor City* (both published
by the University of Illinois Press).
Presently he is working on a social
history of Florida from 1492 to 1992.

Ann L. Henderson is the executive
director of the Florida Humanities
Council. She has a Ph.D. in American
Civilization from George Washington
University and has taught history on all
levels. In the 1980s she served as a U.S.
foreign service officer in Peru and
Honduras, in 1984 receiving the State
Department's Meritorious Honor Award
for excellence in cultural and educational
programs.

*Published by Pineapple Press, Inc.,
Sarasota, Florida*
*Design by Joan Lange Kresek*



Classis

ción original en 1493
Colón describiendo
cubrimientos para
renísimas Altezas,
e Isabel.

# Spanish Los Caminos
# Pathways Españoles
# in en La
# Florida: Florida:
# 1492 – 1992 1492 – 1992

Edited by Ann L. Henderson         Ann L. Henderson
and Gary R. Mormino                y Gary R. Mormino Editores

Translated by Carlos J. Cano, José A.         Traducción de Carlos J. Cano, José A.
Feliciano-Butler, and Warren Hampton          Feliciano-Butler, y Warren Hampton







Pineapple Press, Inc.
Sarasota, Florida

230 THE MORENO FAMILY OF THE GULF COAST

Gabriel de Rivas and María Moreno, his father's sister. In the 1820 Spanish census of Pensacola, Fernando is listed as a civil servant; it appears that he had returned to the medical profession. He is also identified as single, suggesting that his wife had probably died before the census was taken. Fernando owned considerable property in and around Pensacola and became involved in the sale of several large tracts of land, one of which will be discussed shortly. In 1824, Fernando was recommended to serve as an alderman for Pensacola but instead was appointed to the board of health. Three years later, in 1827, he reported on the sickness in Pensacola. He moved to Mobile for a time — he was a member and director of the Spanish Benevolent Society there in 1838 — but later returned to Pensacola, where there are references to Dr. Moreno as late as 1845. His library of about 100 volumes is now located in the John C. Pace Library at the University of West Florida, a gift of the estate of Miss B. A. Murphy.

Arthur, born in 1791, must have died young as there are no references to him after that date.

Virtually nothing is known of Andres after his birth in 1797 until the 1920 census of Pensacola. The census lists him as single and a civil servant, like his brother Fernando.

Fernando, Arthur, and Andres apparently had no offspring; at least we have no record of any. But Francisco, born November 25, 1792, more than made up for all of them.

### Growth of Pensacola

Since Fernando and his sons spent most of their lives in Pensacola, it might be well to say a few words about their hometown. Following the British evacuation of Pensacola in the summer of 1781, Pensacola became a Spanish-French city. The new residents — they numbered some 500 to 600 until about 1803 — occupied the houses left by the British, which consisted of two basic types: the galleried multi-room house and simple modest cottages. The latter were primarily single-story wooden structures with porches facing the street. The structure which frequently replaced the old British house, the Creole cottage, typified Gulf coast architecture of the day. Three considerations dictated the construction of this vernacular housing: the weather, the economy, and the large number of Frenchmen from the Gulf coast and Caribbean living in Pensacola. Commonplace features of these homes included fireplaces, recessed railed verandas, and gabled roofs. Even at the city's peak from 1810 to 1821, Pensacola's houses numbered only about 180 to 210; many of them were multi-family dwellings. The Moreno family owned several of these cottages.

With the sale of Louisiana to the United States in 1803, Pensacola swelled to a reported population of between 1,000 and 3,000 in 1813. The population then declined to 600 or 700 in 1820, not including several

Born in Pensacola in 19?? Mallory was the eldest 1838, she married Steph? lawyer, later elected U Confederate Secretary lived in Key West, Pens? and Richm?

LA FAMILIA MORENO DE LA COSTA DEL GOLFO  231

In the 1820
il servant; it
1. He is also
ied before the
a and around
racts of land,
was recom-
as appointed
orted on the
as a member
3 — but later
oreno as late
the John C.
state of Miss

io references

'97 until the
and a civil

ing; at least
1792, more

'ensacola, it
llowing the
nsacola be-
bered some
he British,
house and
ry wooden
frequently
Gulf coast
nstruction
the large
living in
fireplaces,
peak from
210; many
ed several

Pensacola
1813. The
g several



Born in Pensacola in 1815, Angela Moreno Mallory was the eldest of 26 children. In 1838, she married Stephen Mallory, a rising lawyer, later elected U.S. Senator and Confederate Secretary of the Navy. She lived in Key West, Pensacola, Washington, and Richmond.

Nacida en Pensacola en 1815, Angela Moreno Mallory fue la mayor de 26 hijos. En 1838 se casó con Stephen Mallory, un prometedor abogado que más tarde fue electo Senador de los EE.UU. y Secretario Confederado de la Marina. Ella vivió en Cayo Hueso, Pensacola, Washington, y Richmond.

232 THE MORENO FAMILY OF THE GULF COAST



A mid-eighteenth-century sketch of
Pensacola, published in the *Universal
Magazine*, London, January 1746.

Boceto de Pensacola de mediados del Siglo
18, publicado en el *Universal Magazine*,
Londres, enero 1746.



solicitud de es
para encontra
y más lucrativ
para manten
que su abuelo
pero había m
aquí que pidie
ador en funci
Maxent, aproi
nando y Fran
después.

En 1816 Fe:
de Rivas y Ma
de 1820 de Pen
parece que reg
soltero, sugirie
que se tomara
y en los alreded
grandes terren
Fernando fue r
cambio se le no:
él informó acer
algún tiempo
Beneficencia al
existen referen
100 tomos se
Universidad de
B. A. Murphy.

Arthur, naci
de él después d

Casi nada se
el censo de 1820
público, igual qu

Fernando, Ar
no tenemos dat
de 1792, compe:

Debido a qu
Pensacola, seria
natal". Después
cola se convirtió
— alcanzaban u
las casas aband
siglo, huracanes

solicitud de esta concesión ellos consignaron que habían dejado el servicio para encontrar otra ocupación más conforme a su posición social y gustos y más lucrativa. Se quejaban de que el salario del padre era insuficiente para mantener a la familia. Además, ellos explicaban cuidadosamente que su abuelo había venido a Luisiana para ayudar a poblar la colonia, pero había muerto antes de poder recibir los beneficios esperados. De aquí que pidieran 800 arpendes que ellos pensaban trabajar. El Gobernador en funciones de la provincia, don Francisco Maximiliano de St. Maxent, aprobó la concesión. Aunque faltan detalles, parece que Fernando y Francisco trabajaron parte de la tierra durante varios años después.

En 1816 Fernando se casó con su prima Agueda Rivas, hija de Gabriel de Rivas y María Moreno, la hermana de su padre. En el censo español de 1820 de Pensacola, Fernando está enumerado como empleado público; parece que regresó a la profesión médica. También se le identifica como soltero, sugiriendo que su esposa probablemente había muerto antes de que se tomara el censo. Fernando era dueño de bastante propiedad dentro y en los alrededores de Pensacola y se vio relacionado en la venta de varios grandes terrenos, uno de los cuales examinaremos en breve. En 1824 Fernando fue recomendado para servir de regidor de Pensacola, pero en cambio se le nombró a la junta de salubridad. Tres años después, en 1827, él informó acerca de la enfermedad en Pensacola. Se mudó a Mobile por algún tiempo — era miembro y director de la Sociedad Española de Beneficencia allí en 1838 — pero más tarde regresó a Pensacola, donde existen referencias al Dr. Moreno hasta 1845. Su biblioteca de cerca de 100 tomos se encuentra ahora en la Biblioteca John C, Pace de la Universidad de la Florida Occidental, regalo del patrimonio de la Srta. B. A. Murphy.

Arthur, nacido en 1791, debió de morir joven ya que no hay referencias de él después de esa fecha.

Casi nada se sabe de Andrés después de su nacimiento en 1797 hasta el censo de 1820 de Pensacola. El censo lo incluye como soltero y empleado público, igual que su hermano Fernando.

Fernando, Arthur y Andrés aparentemente no tuvieron hijos; al menos no tenemos datos al respecto. Pero Francisco, nacido el 25 de noviembre de 1792, compensó esto con creces.





mediados del Siglo
*rcial Magazine.*
a 1748.

## Crecimiento de Pensacola

Debido a que Fernando y sus hijos vivieron casi toda la vida en Pensacola, sería apropiado decir algunas palabras acerca de su "pueblo natal". Después de la evacuación británica en el verano de 1781, Pensacola se convirtió en una ciudad hispano-francesa. Los nuevos residentes — alcanzaban un número entre 500 y 600 hasta eso de 1803 — ocuparon las casas abandonadas por los británicos. Sin embargo, hacia finales del siglo, huracanes, fuegos y el deterioro habían destruido casi todas las

234 THE MORENO FAMILY OF THE GULF COAST

hundred or more slaves. Taverns, billiard parlors, barbershops, butcher shops, and stores dominated the commercial establishments in town, while several sawmills, a brickyard, and a tannery existed on the city's periphery.

The most popular sport for the men was billiards. Dancing and gambling were also popular pastimes. The Tivoli dance hall — later the Hotel de Paris owned by Francisco Moreno — also had rooms for card-playing and gaming. From all accounts, Pensacolans loved to gamble. This was the Pensacola in which Francisco Moreno lived and raised his families.

For several years, Francisco apparently farmed the large tract of land given to him and Fernando in 1810. In 1815, he married Doña Josefa López, the legitimate daughter of Don Joseph Anthony López, by then deceased, and Doña María Victoria Calder. In the same year, Josefa gave birth to a daughter, Angela. In 1817, a son, Francisco Jr. was born and the following year a daughter, Josefa, appeared. Unfortunately, both Francisco's wife and daughter, the two Josefas, died in 1820. Thus only two of Francisco's children, who were born before July 17, 1821 (the date Andrew Jackson accepted the transfer of Spanish West Florida to the United States), survived the Spanish era in Pensacola history. However, Francisco married twice after his first wife's death. He married her sister, Margarita Eleutaria, who bore twelve children between 1822 and 1851, when she died. He then married seventeen-year-old Mentoria González in 1852, and she gave birth to twelve more children between 1853 and 1873. Eight of Francisco's twenty-seven children died young. That left nineteen of them to reach adulthood.

It is difficult to separate fact from fiction about Don Francisco. It is said that about 1828, Francisco and his brother Fernando sold their 800 arpents of land near Fort San Carlos de Barrancas to the U.S. government for $3,000. The land became a part of the U.S. Navy Yard and is a part of the Pensacola Naval Air Station to this day. Francisco apparently used his share of the money to become Pensacola's first banker. He kept his money in a chest that he hid under his bed. When he made a loan, the money — supposedly only gold — came from this chest. The chest is now on display in the Moreno room of the Walton House in Pensacola. He also bought and sold large amounts of land in and around Pensacola. He may have opened the first hotel in the city, the Hôtel de Paris. In 1836, he became the Spanish consul for Pensacola, a post he held until the end of the Civil War. He also owned a number of slaves: in 1850, he owned twenty-one slaves; in 1860, he owned thirty slaves. After emancipation, three of the slaves elected to remain with the Moreno family — Old Mose, Uncle Dick, and Teresa. Francisco's social and financial status was such that he was often referred to as the King of Pensacola.

Thirteen of Francisco's sons, sons-in-law, and grandsons served the Confederate cause. Two were killed in combat: Lieutenant Francisco

# THE
# OLDEST CITY



# ST. AUGUSTINE
# SAGA OF SURVIVAL

*Edited by Jean Parker Waterbury*

## AUTHORS

George E. Buker   •   Amy Bushnell   •   Robert N. Dow Jr.

Thomas Graham   •   John W. Griffin

Patricia C. Griffin • Daniel L. Schafer • Jean Parker Waterbury

Copyright 1983 by the St. Augustine Historical Society
Published in the United States by the St. Augustine Historical Society

Library of Congress Catalogue Card Number: 83-50479

Manufactured in the United States of America
First edition

Cover design: Joseph S. Mark
ISBN 0-961-2744-0-9 pbk.
ISBN 0-961-2744-1-7

Illustrations
The Contrib
Preface....
Chapter One
        The
        800(
        by ]
Chapter Two
        The
        156:
        by /
Chapter Thre
        The
        1668
        by J
Chapter Four
        - . . .
        1763
        by D.
Chapter Five
        The S
        1784 -
        by Pa
Chapter Six ..
        The A
        1821 -
        by Ge
Chapter Seven
        The Fl
        1865 -
        by The
Chapter Eight
        Yester
        1913 to
        by Rob
Major Sources..
Index .........

Island. Two soaring spires decorated with orange terra-cotta ornamentation flanked the hotel's central dome, adding a final touch of lofty majesty to the whole creation.

Magnificent though it was, the Hotel Ponce de Leon was only the centerpiece of a whole program of additions and alterations Flagler planned for St. Augustine. Across the way from the Ponce de Leon, also on filled land, he built the Alcazar, a smaller hotel which offered slightly more modest accommodations for the overflow from his major hotel. The Alcazar also contained an arcade of shops for the hotel's guests, and to the rear there was an elaborate health and entertainment casino. The Casino contained a large indoor swimming pool, several types of therapeutic baths, steam rooms, a gymnasium, bowling alley and dance floor. The Alcazar continued Carrere and Hastings' Spanish Renaissance architecture, making it a fitting complement to the Ponce de Leon.



Franklin W. Smith entered into the spirit of the moment by erecting the Casa Monica Hotel just across Cordova Street from Flagler's hotels. The walls of Smith's exuberant medieval Moorish castle were of the same cast concrete as the Ponce de Leon and Alcazar and his own Villa Zorayda. Inside was a large, glassed-over patio, the Sun Room, where winter chills were completely banished. The effort to complete the hotel, however, proved too much for Smith's finances, and he sold out to Flagler, who renamed the hotel the Cordova and added it to his enterprises.

To insure that guests could reach his hotels, which were, after all, on the edge of the Florida frontier, Flagler purchased the railroad running north from St. Augustine to the St. Johns River and built the first bridge across the river to connect with the rail lines from the north. Henceforth, a traveler could step out of the dismal, frigid weather of New York City into a Pullman "palace" car and thirty-five hours later step out into the warm sunshine and blossoming flowers at Flagler's new railroad station in St. Augustine. The magic of changing winter into spring overnight captured the imagination of the winter-bound north and set the Florida tourist industry booming.

From the rail depot travelers went to the hotels in brightly



The Spanish R
built by Henry
Street, the Alca
Moorish archi
triumvirate.

orange terra-cotta
ome, adding a final
n.

e de Leon was only
ions and alterations
the way from the
e Alcazar, a smaller
:commodations for
r also contained an
the rear there was
). The Casino con-
ral types of thera-
bowling alley and
re and Hastings'
a fitting comple-

)f the moment by
rdova Street from
it medieval Moor-
he Ponce de Leon
side was a large,
vinter chills were
he hotel, however,
old out to Flagler,
added it to his

which were, after
ler purchased the
he St. Johns River
inect with the rail
ild step out of the
Pullman "palace"
e warm sunshine
ad station in St.
spring overnight
north and set the

otels in brightly





The Spanish Renaissance Hotel Ponce de Leon (top) was the first
built by Henry M. Flagler, opening in 1888. A year later, across King
Street, the Alcazar (lower right) welcomed guests. The Cordova, of
Moorish architecture (lower left) completed the luxurious
triumvirate.